COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DANIEL J. BOLLNER, ET UX. DOROTHY L. BOLLNER; GEORGE J. QUICK, ET UX. NORMA A. QUICK, | § | No. 08-06-00152-CV |
| Appellants, | § | Appeal from the |
| v. | § | 380th District Court |
| PLASTICS SOLUTIONS OF TEXAS, INC., A TEXAS CORPORATION; | § | of Collin County, Texas |
| PLASTICS SOLUTIONS MOLDING, INC., A TEXAS CORPORATION; AND | § | (TC#380-1399-04) |
| KURT H. RUPPMANN, SR., INDIVIDUALLY AND FAIRFIELD | § | |
| ENTERPRISES, INC., | § | |
| Appellees. | § | |

## **O P I N I O N**

Appellants, Daniel J. Bollner, Dorothy L. Bollner, George J. Quick, and Norma A. Quick (collectively, the "Bollners") appeal a take-nothing judgment following a bench trial on various contract and tort claims which they brought initially against Appellees Plastic Solutions of Texas, Inc. ("PST"), Plastic Solutions Molding, Inc. ("PSMI"), and Kurt H. Ruppman, Sr. (sometimes collectively referred to as the "PST Defendants"). By amendment, Appellants later added claims against Fairfield Enterprises, Inc. ("Fairfield"); a take-nothing judgment was also entered on those claims. We affirm the judgment of the trial court.

# BACKGROUND

Appellants George and Norma Quick are the parents of David J. Quick.[1]  Appellant Daniel

Bollner is Quick's uncle, and Appellant Dorothy Bollner is Daniel's wife.  Quick is a certified public

accountant.  In 1994, he started his own accounting practice.

Shortly thereafter, Quick met Ruppman, who was then serving as president of Piper Plastics.

Ruppman left Piper Plastics later that year, and he founded PST in 1995.  Ruppman began

experimenting with the use of very cold temperatures in the manufacture of hot-fill PET

(Polyethylene Terephthalate) plastic bottles.  He developed a process by which preform plastic

bottles were heated, stretched with a stretch rod, injected with liquid nitrogen at high pressure, and

molded.  Ruppman referred to the process as "cryogenic," because of the cold temperatures involved,

caused by the presence of liquid nitrogen.  Ruppman applied for and received a patent for his

process.

During this time, Quick did some work for Ruppman by preparing projections and forecasts

for potential business pursuits.  Ruppman informed Quick that he was not able to pay him for such

services.  Nevertheless, Quick was impressed with Ruppman's knack for ideas and saw a potential

financial gain in working for an interest in Ruppman's business.  In early 1995, Quick and Ruppman

discussed an agreement which Quick had prepared that would give him an interest in PST.  The two

discussed various terms, but never executed the agreement.  Quick, however, believed that he had

an oral agreement for 5 percent of the gross margin of Ruppman's business.  In return, according to

---

[1] David Quick brought similar claims against Appellees in a lawsuit styled *David J. Quick v. Plastics Solutions of Texas, Inc., a Texas Corporation; Plastics Solutions Molding, Inc., a Texas Corporation; Kurt H. Ruppman, Sr., Individually and Fairfield Enterprises, Inc.*, Cause No. 380-2143-04, in the 380th District Court of Collin County, Texas, which is the subject of a companion appeal.  The Bollners' claims and those of David Quick were tried together.  Future references herein to "Quick" shall be to David Quick, unless either of his parents is specified by name.

Quick, he was to provide various services, including accounting services.

Beginning in late 1995, Ruppman entered into a series of agreements with the Ball Corporation ("Ball"), pursuant to which Ball acquired exclusive licensing rights to Ruppman's patented process. Under the Agreements, Ball paid a total of $1.5 million to PST during 1995 and 1996. PST was obligated to use its best efforts to develop a commercially viable process for manufacturing bottles, using the cryogenic technology. If PST could do so, Ball was obligated to commit to firm orders for production machinery or market sub-licenses of the patented technology. Ball and PST agreed to split any sub-licensing revenue. During the following months, Ruppman attempted to develop such a commercially viable process to manufacture PET bottles using the cryogenic technology.

Sometime in late 1996 or early 1997, Quick assisted Ruppman in locating two eventual investors in PST--J. Lewis Partners ("J. Lewis") and ELK Trust. J. Lewis and ELK Trust loaned a total of $650,000 to PST. In addition, PST granted each a royalty interest in revenues generated by income from licensed patents, products, and technical information. Ruppman and PST also agreed to grant Quick a royalty interest of 3 percent in the same revenue, and, on January 23, 1997, Ruppman, PST, and Quick executed the agreement.

Ball is well-known in the container industry. Due to its participation with Ball, many people in the plastics industry were interested in PST's cryogenic technology. PST had very high expectations for the relationship with Ball and believed that Ball, which had become the exclusive sub-licensor of the technology, would be successful in licensing it. Ball, in turn, appeared to believe that the licensing would be successful, and it represented to PST that it was a good technology.

In the spring of 1997, Ruppman attended a conference known as Bev Pak. The major plastic

3

companies and numerous companies from around the world attended. PST, Ball, and others gave a presentation at the Bev Pak conference regarding the technology. Following Ruppman's portion of the presentation, Ball representatives announced that they could not talk about the technology and would not license it, because it was too premature. The Ball announcement had a severely negative impact on PST's business. PST's plans for significant licensing revenue from Ball vanished, and the relationship between PST and Ball deteriorated. The two companies disputed whether the technology was commercially viable. Ultimately, an arbitrator concluded that the technology had not been commercially viable. PST settled the dispute by repurchasing the licensing rights granted to Ball.

By May of 1997, PST was cash broke and needed additional investment. At the time, PSMI, which was a wholly-owned subsidiary of PST started by Ruppman as a small manufacturing operation, was manufacturing flower-pot carrying trays, high density bottles for fertilizer, and PET water bottles. This brought in approximately $40,000 to $50,000 a month. Ruppman asked Quick to approach J. Lewis to solicit additional investment. Ruppman faxed Quick a list of potential deal "sweeteners," in an effort to get them to invest again, but J. Lewis refused to make any additional investments.

Thereafter, Quick approached his relatives, the Bollners, about investing. Dan Bollner had met Ruppman some months before and was impressed with PST. On May 23, 1997, George and Norma Quick agreed to loan PST $25,000 and entered into a Royalty Revenue Agreement whereby they were granted a 0.25 percent interest in the "Net Royalty Income Revenue" of PST and its affiliates. A few days later, Daniel and Dorothy Bollner agreed to loan PST $75,000, and they entered into similar royalty agreements whereby Daniel received 0.45 percent and Dorothy received

4

0.30 percent of PST's "Net Royalty Income Revenue."[2]  Other than the differences in the parties and the royalty amounts, the three Royalty Revenue Agreements (collectively, the "Agreements") contain identical terms.  Unlike Quick's royalty agreement, the Agreements contained the "sweetener" provisions that had been previously proposed to J. Lewis.

The Agreements grant a percentage of Net Royalty Income Revenue, which is calculated by deducting from Royalty Income Revenue legal fees and costs incurred in enforcing PST patent rights or defending PST against claims for infringement.  The Agreements provide that:

> Royalty Income Revenue shall mean income derived from Licensed Products, Licensed Patents and Licensed Technical Information.  Royalty Income Revenue shall also include income derived from:
>
> a.) Heat-Set Bottle Technologies[.]
> b.) Preform Technologies, both licensing and net income from manufacturing.
> c.) Licensing of the new Coated Base Technology.
> d.) Additive Technology Licensing or sales.
> e.) Recycling system technology licensing.
> f.) Net Income of Plastic Solutions Molding, Inc. manufacturing operations.
> g.) Any and all sales of technologies including net proceeds from the sale of manufacturing operations.
> h.) PST[']s participation in revenues from BOC nitrogen sales, if any.
> i.) Licensing revenues from sub-licensing of the BOC nitrogen delivery system, if any.
> j.) Such other revenue streams that PST may from time to time develop in the plasitic [sic] industry.  If such revenue streams are of a manufacturing nature, the participation will be in net income.  If such revenue streams are from licensing or the like, such participation shall be in the gross revenue net of

---

[2] The Agreements included PST, Ruppman, and "their affiliates" and were executed by Ruppman individually and as president of PST, PSMI, and Plastic Solutions, Inc.

administrative costs.[3]

About the time the Bollners entered into the Agreements, PSMI's manufacturing revenue dropped, because its handful of customers were experiencing problems of their own. By the fall of 1997, PST and PSMI were in dire financial condition. PST was no longer able to make the payments required under the Bollner notes. This put a strain on the relationship between Ruppman and Quick.

In October 1997, PST received $200,000 from a nitrogen supply company known as BOC. BOC was willing to provide money to help PST stay afloat, in the hopes that PST could

---

[3] The Agreements define "Licensed Patents" as:

[A]ll applications for patents and all continuations, continuation-in-part and divisional applications and all patents that may issue from such applications and all reissues thereof in all countries of the world which are owned or controlled by PST and which relate to PST Present Technical Information and PST Future Technical Information or any improvements, additions, innovations, changes, enhancements, modifications or the like relating or pertaining thereto. Licensed Patents include, but are not limited to, UPS. Patent Application Serial No. 08/412535 filed March 27, 1995 (["]the Patent") and any patents granted thereon and any corresponding foreign patents. As additional applications patent are filed and patents granted thereon, they shall be identified to Participant by PST and included herein.

In paragraph 1.2, the Agreements define PST "Present Technical Information" as:

[A]ll designs, data, know-how, technical information and methods, processes and techniques which are in PST's possession or control on the date hereof relating or pertaining to PST's processes for making plastic products. PST Present Technical Information will include, but not be limited to, all drawings, documentation, specifications, computer programs (both source code and object code) and written reports. PST Present Technical Information includes the Patent.

The Agreements define "PST Future Technical Information" as:

[T]hose designs, data, know-how, technical information and methods, processes and techniques as defined in paragraph 1.2 except for the fact that it is acquired or developed after the date hereof, including, but not limited to, improvements, additions, innovations, changes, enhancements and modifications to Licensed Products or Licensed Process including changes and enhancements which relate cryogenic applications [to] any and all types of plastic manufacturing processes, methods, or techonologies [sic].

"Licensed Technical Information" is defined as "PST Present Technical Information and PST Future Technical Information."

"Licensed Products" is defined as being "all products utilizing, incorporating or based upon any Licensed Technical Information."

6

commercially develop the cryogenic technology, which used liquid nitrogen. BOC ultimately agreed to provide PST with $1.5 million for a potential marketing agreement and a share in revenue. However, this infusion of cash was made on the condition that the money be repaid as a loan, at BOC's election. BOC tried unsuccessfully to license PST's cryogenic technology and eventually opted to cancel the agreement and seek repayment from PST.[4]

By April 1998, PST was again in desperate financial condition and was about to shut down. Ruppman met John Albers, a potential investor. Through Fairfield, an investment company that he founded, Albers decided to invest enough in PST to keep it alive for a few more months. Prior to investing more, however, Albers and Fairfield wished to review PST's financials.[5] In doing so, Albers learned that PST had granted royalty interests to various royalty investors. Albers decided to invest substantially in PST and PSMI and wanted PST and PSMI to reacquire the royalty interests in order to "clean up" PST's balance sheet. Subsequently, Albers' attorney entered into negotiations with Quick regarding repayment of the notes and acquisition of the royalty agreements. Eventually, the parties agreed to extend the repayment period, and the notes were paid off with interest. However, the Bollners insisted on keeping their interests in the Agreements.

Thereafter, the Bollners filed this lawsuit, asserting claims against the PST Defendants in tort and contract relating to the royalty Agreements. The Bollners also sought a declaratory judgment as to their rights under the Agreements. The PST Defendants filed a counterclaim for a declaratory judgment and usury. Subsequently, the Bollners brought Fairfield into the lawsuit, asserting various

---

[4] PST and Ruppman were ultimately unsuccessful in convincing the bottling industry to use the technology.

[5] Through Fairfield, Albers ultimately invested over $20 million in PST and PSMI. Fairfield has yet to receive any return on its investment.

causes of action against it, based on a theory of vicarious liability.[6] The PST Defendants filed a motion for summary judgment arguing that any claims for relief for the period prior to June 1, 2000, were barred by limitations. The trial court granted summary judgment as to all contract claims prior to June 1, 2000. The court also granted summary judgment in favor of Fairfield on all of the Bollners' claims.[7]

At trial, the Bollners focused on their contract claims and sought to recover: (1) a 1 percent royalty on an alleged licensing fee received from BOC; (2) a 1 percent royalty on gross revenue of PSMI; and (3) an additional 1 percent royalty on PSMI's net manufacturing revenue, for which the Bollners sought an accounting. Following a six-day bench trial, the trial court entered a take-nothing judgment against the Bollners and the PST Defendants on all of their respective claims, with the exception of the parties' requests for a declaratory judgment. The trial court awarded Fairfield attorney's fees and costs under the Uniform Declaratory Judgments Act ("UDJA"). TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001 *et seq.*

The trial court filed findings of fact and conclusions of law, in which it concluded that "The unambiguous and proper construction of the term 'Net Royalty Income Revenue' is limited to manufacturing income PST or PSMI received on or after the date of each respective Contract in May, 1997 less all cumulative losses suffered by PST and/or PSMI from inception of those companies to the date of calculation." Alternatively, the court concluded, "Should the Contract be determined by an appellate court to be ambiguous in regard to whether the Contract term 'Net Royalty Income

---

[6] In their Original Petition, the Bollners requested a declaratory judgment against all defendants. That claim was retained in their Third Amended Petition, which was the live pleading upon which the parties went to trial.

[7] The Bollners do not challenge these judgments.

Revenue' includes anything other than the manufacturing income calculated as referenced in the preceding paragraph, then the intention of the partes [sic] to the Contract controls and that intention limits the scope of that term as described in the preceding paragraph." The trial court found that the parties intended that the PST Defendants "be obligated to pay Plaintiffs a royalty under the terms of the Contract only if manufacturing income PST or PSMI received on or after the date of each respective Contract in May, 1997 exceeded all cumulative losses suffered by PST and/or PSMI from inception of those companies to the date of calculation." The Bollners ask us to reverse and render judgment for them or, alternatively, to reverse and remand for a new trial.

## DISCUSSION

### I. Standard of Review

The standards of review for claims of legal and factual sufficiency of the evidence govern appeals of non-jury trials on the merits. *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex.1997). When a party appeals from a non-jury trial, it must complain of specific findings and conclusions of the trial court. *Carrasco v. Stewart*, 224 S.W.3d 363, 367 (Tex. App.--El Paso 2006, no pet.); *see also Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 580 (Tex. App.--El Paso 2004, pet. denied). A general complaint against the trial court's judgment does not present a justiciable question. *Carrasco*, 224 S.W.3d at 367; *Serrano*, 162 S.W.3d at 580.

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano*, 162 S.W.3d at 579. When, as here, the party with the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id.* An appellate court will sustain a legal sufficiency or "no-evidence" challenge,

9

if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Carrasco*, 224 S.W.3d at 367 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)).

Findings of fact made by the trial judge, sitting as the fact finder, enjoy the same status as findings of a jury. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Heritage Resources, Inc. v. Hill*, 104 S.W.3d 612, 619 (Tex. App.--El Paso 2003, no pet.). Where the party with the burden of proof is challenging the factual sufficiency of the findings, the appropriate complaint is that the adverse findings are "against the great weight and preponderance of the evidence." *Tate v. Tate*, 55 S.W.3d 1, 5 (Tex. App.--El Paso 2000, no pet.). In reviewing a factual sufficiency point, we must consider all of the evidence and determine whether the adverse finding was so against the great weight and preponderance of the evidence that it was clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We do not pass upon the witnesses' credibility, nor do we substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

We review a trial court's conclusions of law *de novo*. *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 322 (Tex. App.--El Paso 1995, writ denied). Erroneous conclusions of law are not binding on the appellate court, so, if the controlling findings of fact will support a correct legal theory, are supported by the evidence, and are sufficient to support the judgment, the trial court's adoption of an erroneous legal conclusion will not mandate reversal. *Heritage Resources*,

104 S.W.3d at 621.

## II. Issue One

In their first issue, the Bollners contend that the trial court erred in reaching Conclusions of Law Nos. Three, Four, and Five and that the trial court improperly reformed the Agreements. The Bollners contend that these conclusions are based on legally and factually insufficient evidence.[8] We construe the Bollners' arguments as challenging whether the trial court correctly based its conclusions on the facts.

### A. Conclusions of Law Nos. Three and Four

In Conclusion of Law No. Three, the trial court held:

> The unambiguous and proper construction of the term "Net Royalty Income Revenue" is limited to manufacturing income PST or PSMI received on or after the date of each respective Contract in May, 1997 less all cumulative losses suffered by PST and/or PSMI from inception of those companies to the date of calculation.

In Conclusion of Law No. Four, the court held:

> Should the Contract be determined by an appellate court to be ambiguous in regard to whether the Contract term "Net Royalty Income Revenue" includes anything other than the manufacturing income calculated as referenced in the preceding paragraph, then the intention of the partes [sic] to the Contract controls and that intention limits the scope of that term as described in the preceding paragraph.

The trial court found, in its Finding of Fact No. Four, that:

> The intention of the parties to the Contract was for the PST Defendants to be obligated to pay Plaintiffs a royalty under the terms of the Contract only if manufacturing income PST or PSMI received on or after the date of each respective Contract in May, 1997 exceeded all cumulative losses suffered by PST and/or PSMI from inception of those companies to the date of calculation.

---

[8] A trial court's conclusions of law are reviewed as a legal question, and an appellant may not challenge a conclusion of law for factual sufficiency. *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 883 (Tex. App.--El Paso 2005, pet. denied). A reviewing court "may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id.*

11

The Bollners contend that foregoing conclusions[9] and finding are incorrect, because the trial court ignored evidence of three revenue streams which, they contend, were subject to the Agreements.

First, they contend that the Agreements provide for a royalty of 1 percent of gross income from the total sales of "Licensed Products." Second, the Bollners argue that they are entitled to 1 percent of PSMI's net manufacturing income, pursuant to paragraph 1.6(f) of the Agreements. Thus, according to the Bollners, the Agreements provide them with both a 1 percent gross royalty on any income of PST and PSMI (including manufacturing income of PSMI) and an additional 1 percent royalty on net manufacturing income of PSMI. Third, the Bollners argue that the trial court also ignored their right to recover royalties from a licensing agreement between Ruppman and PST (the "Ruppman Licenses").

In support of their gross revenue argument, the Bollners point to the broad definitions of "Licensed Products," "Licensed Patents," and "Licensed Technical Information" (both "Present" and "Future") as evidence of this intent. They argue that the Agreements clearly support a gross revenue claim, because the term "income" is used in paragraph 1.6 to define Royalty Income Revenue, as opposed to the term "net income." The Bollners further contend that "Present Technical Information" broadly includes "all designs, data, know-how, technical information and methods, processes and techniques which are in PST's possession or control on the date hereof relating or pertaining to PST's processes for making plastic products." "Future Technical Information" includes anything that is defined as Present Technical Information, but that is acquired or developed after the date of the Agreements. "Future Technical Information" also includes "changes and enhancements

_____

[9] For the reasons explained in footnote 8, supra, we review the legal conclusions only for legal insufficiency.

12

which relate cryogenic[10] applications [to] any and all types of plastic manufacturing processes, methods, or techonologies [sic]." The Bollners argue that, because of this definition, they have an interest in virtually every product that has been manufactured by PSMI, because PSMI "uses" processes and technology that are covered by this language and anyone who "uses" such changes and enhancements is a licensee. Therefore, the Bollners argue, the Agreements entitle them to a 1 percent royalty on gross revenue from PST and PSMI.

We cannot say that, as a matter of law, the Agreements unambiguously provide the Bollners with a royalty interest in both gross and net revenue. Moreover, there is evidence to support Finding of Fact No. Four. There was testimony by Ruppman that the Agreements provided the Bollners an interest in net income of PSMI's molding operation. Ruppman testified as to his belief the net income had not been reached, because the PST Defendants were permitted to carry forward their losses in computing whether anything was due under the royalty. The circumstances surrounding the Agreements also support the trial court's finding. At the time that ELK Trust and J. Lewis Partners invested in PST and entered into the royalty agreements with Ruppman and PST, there were very high expectations regarding the potential for PST's relationship with Ball to generate significant income from licensing, and this was the reason that people were willing to invest in PST. PSMI had only recently been formed by Ruppman to manufacture flower trays and water bottles. PSMI did not

_____

[10] At trial and in their briefs to this court, the parties debate the meaning of the word "cryogenic," with the Appellants insisting that it relates to the use of nitrogen. In the absence of a contractual definition, we can resort to a standard dictionary. *See Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 833 (Tex. App.--Dallas 2003, pet. denied) ("[w]here terms are not defined in agreements, we will use the plain, ordinary and generally accepted meaning attributed to the term or word. . . . Dictionaries may provide assistance to courts in finding that meaning"); *see also Dimotsis v. State Farm Lloyds*, 5 S.W.3d 808, 811 (Tex. App.--San Antonio 1999, no pet.) ("It is proper to determine the plain meaning of a term by referring to a dictionary."). We apply the dictionary definition of "cryogenic," which references "very low temperatures," not "nitrogen." *See* WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 484 (rev. ed. 2003) ("of or pertaining to the production or use of very low temperatures").

13

have the capability to do substantial manufacturing at the time. However, after the rift in the PST-Ball relationship, the expectations for licensing income essentially vanished.

Ruppman then began to focus on expanding manufacturing operations. The "sweetener" provisions contained in the Bollners' Agreements were initially proposed to J. Lewis after the rift with Ball, in the hopes of gaining additional investment by providing a royalty on revenue from PSMI's manufacturing income. Thus, prior to the rift with Ball, the focus of PST's business had been on licensing its technology. Afterwards, the "sweeteners" were added by Quick to include net manufacturing income. Although there was contrary testimony by Quick and Daniel Bollner as to the intent of the parties, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id.* at 820. The trial court's factual finding was not against the great weight and preponderance of the evidence.

The Bollners also argue that the trial court erred by ignoring evidence regarding income from the Ruppman Licenses. As part of this, the Bollners argue for the first time on appeal that they are entitled to $34,000, which equals a 1 percent royalty on all payments contemplated in the Ruppman Licenses from June 1, 2000, through the date of judgment. Although the Ruppman Licenses were discussed at trial, the issue was not presented in the Bollners' damage calculations, no damage amount was presented to the trial court, and no findings of fact or conclusions of law were filed concerning it. Accordingly, the Bollners waived this claim. TEX. R. APP. P. 33.1(a).[11]

---

[11] Moreover, even if the claim had been presented, the evidence at trial showed that it was barred by the statute of limitations, because, on July 1, 1999, Ruppman had assigned all of his right, title, and interest in the patents and confidential information concerning the cryogenic technology to PST. This was a requirement of Albers as part of his investment in PST. After this date, no royalties were paid to Ruppman.

14

The Bollners further contend that the trial court ignored evidence presented regarding PSMI's net manufacturing income. However, the Bollners never presented a damages claim based on net manufacturing income. Instead, the Bollners claimed that they could not determine the damages and therefore sought an accounting. The trial court denied this claim, and the Bollners have not appealed it. The Bollners cannot raise on appeal that which was not raised in the trial court. TEX. R. APP. P. 33.1(a). Accordingly, we determine that there was sufficient evidence to support Finding of Fact No. Four, and consequently, Conclusion of Law No. Four. We overrule this issue. Because we have uphold Conclusion of Law No. Four and Finding of Fact No. Four, we do not address the Bollners' arguments concerning Conclusion of Law No. Three.

**B. Conclusion of Law No. Five**

The Bollners also challenge the trial court's conclusion that the PST Defendants did not breach any term of the Agreements and that the PST Defendants were entitled to a take-nothing judgment on their breach of contract claim. The Bollners argue that the conclusion is erroneous, because the PST Defendants' defense of offset was raised for the first time at trial and was unsupported by the PST Defendants' live pleadings.

The right of offset is an affirmative defense, and the burdens of pleading offset and proving facts necessary to support the claim are on the party asserting it. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex.), *cert. denied*, 449 U.S. 1015 (1980); *cf.* TEX. R. CIV. P. 94. In their First Amended Answer and Counterclaim, the PST Defendants pleaded that "[n]o royalties have been paid under the Bollner/Quick Royalty Agreements, because PST has never realized, during the term of these agreements, any revenue from any licensing agreement nor has it received 'net income' associated with PSMI's manufacturing process." The PST Defendants also pleaded

15

as a defense that the Bollners' claims were barred by "offset or set off based upon counterclaims asserted below." In their first counterclaim, the PST Defendants sought a declaratory judgment that "their rights and obligations under the Bollner/Quick Royalty Agreements to the extent necessary and/or appropriate to establish that no sums are due and owing to David Quick's mother, aunt and uncle under the terms of the Bollner/Quick Royalty Agreements." This was sufficient to plead the defense of offset. We overrule this point of error.[12]

## C. Reformation

The Bollners contend that the trial court, without the requisite pleadings, reformed the Agreements. Specifically, the Bollners argue that the trial court added new terms to the contract and effectively reformed it by concluding that the term "Net Royalty Income Revenue" was limited to net income and not gross income. The Bollners also argue that the trial court "simply deleted" provisions from the Agreements that provided the Bollners with a royalty interest in the technology and improvements to the technology allegedly used by PSMI.

"The underlying objective of reformation is to correct a mutual mistake made in *preparing* a written instrument, so that the instrument truly reflects the *original* agreement of the parties." *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) (emphases in original) (citing *Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160, 163 (Tex. Civ. App.--Texarkana 1980, writ ref'd n.r.e.)). Reformation requires two elements: (1) an original agreement and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing. *Id.* (emphasis in original) (citing *Sun Oil Co. v. Bennett*, 125 Tex. 540, 547, 84 S.W.2d 447, 451 (1935);

_____

[12] The Bollners also argue that the Agreements were breached because royalty payments were owed and were not paid by the PST Defendants. Because we have overruled the Bollners' point of error concerning Conclusion of Law No. Four, we need not address this argument.

RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (1979)).

No party contends that there was a mutual mistake in drafting any of the Agreements, and the trial court did not, and did not purport to, reform them.

**D. Uniform Declaratory Judgments Act**

Both the Bollners and the PST Defendants sought declaratory judgments as to their rights under the Agreements.[13]  "[T]he Uniform Declaratory Judgment[s] Act operates to provide an individual whose rights and legal relations are at issue in a contractual dispute a vehicle by which he can solicit the court to resolve questions of construction or validity under the contract." *Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 331 (Tex. App.--San Antonio 1998, pet. denied).  A declaratory judgment requires a justiciable controversy as to the rights or status of the parties and the declaration must actually resolve the controversy. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004).  "In suits for declaratory relief, a trial court has limited discretion to refuse a declaratory judgment, and may do so only where judgment would not remove the uncertainty giving rise to the proceedings." *SpawGlass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.-- Houston [14th Dist.] 1998, pet. denied).

The central dispute in this case was whether any royalties were owed under the terms of the Agreements.  The Bollners requested a declaration as to their rights to receive royalty payments and specifically requested declarations "that Plaintiffs are entitled to be paid their proportionate share of Net Royalty Income Revenue, as that term is defined in the Agreements . . ." and that "the royalty payments apply to income derived from manufacturing plastic products."  The PST Defendants

---

[13] Fairfield also sought a declaratory judgment "in favor of Fairfield and against Plaintiff for Fairfield's costs and reasonable and necessary attorneys' fees as are equitable and just."

17

sought a declaration that no sums were due and owing under the terms of the Agreements. The PST Defendants also raised the issue of offset in their pleadings.

As noted, the Agreements use the term "net income" when describing manufacturing income to PSMI. The Agreements also provide that revenue streams of a manufacturing nature will be paid on net income. The payment and accounting provisions require the PST Defendants to pay continuing royalties on a monthly basis for all Net Royalty Income Revenue and to provide a monthly statement of accounting setting forth the amount of Net Royalty Income Revenue earned and collected from each *licensee* in the preceding calendar month. Consequently, the Agreements do not clearly set out a method for calculating net income from manufacturing. At trial, the parties disputed whether they require calculation of "net income" on a monthly or annual basis. The Bollners argued that they are entitled to a royalty for any month in which there is net income, regardless of whether PSMI has annual net income. The Bollners' accounting expert, David Quick, testified that accounting for net manufacturing income was to be done on a monthly basis.[14]

The PST Defendants' accounting expert testified that annualized accounting is an easier method for determining royalties and that companies the size of PSMI commonly perform accounting functions on an annual basis. The expert also testified that determining net income on an annual basis provides a truer representation of net income, because it allows for year-end adjustments such as those involving inventory. With regard to the offset of prior-year losses, Ruppman testified to his belief that such losses were to be taken into account in determining PSMI's

_____

[14] Quick provided financial and accounting services to PST and PSMI from approximately January 1995 through May 1998, including the preparation of tax returns. The Agreements were entered into in May of 1997. The record indicates that Quick drafted paragraph 1.6 of the Agreements, which defines in large part the applicable revenue streams, including net income. Despite Quick's apparent familiarity with the accounting practices at PST and PSMI, the Agreements fail to set out a clear method for computing net income.

net income. The PST Defendants' accounting expert testified that, where a royalty agreement is silent as to whether prior-year net operating losses could be offset against current year gains, courts and entities have permitted offset in some instances and have not in others, depending on the parties' intent with regard to the royalty.

In Conclusion of Law No. Seven, the trial court held:

> Pursuant to and in accord with the [UDJA], the Court declares that the Contract is limited and applies only to manufacturing income PST or PSMI received on or after the date of each respective Contract in May, 1997 and only to the extent that any such income exceeds all cumulative losses suffered by PST and/or PSMI from inception of those companies to the date of calculation.

Although the Agreements did not provide clear guidance on the calculation of net income, this was not a situation where a provision was left out of a contract because of mutual mistake. The trial court did not reform the Agreements, but merely construed the terms of the Agreements in light of the evidence and the parties' requests for declaratory judgment.

Appellants did not expressly object to Conclusion of Law No. Seven in their brief. Even if we assume that their claims of contract reformation could be deemed to preserve their objection to the trial court's Conclusion of Law No. Seven, we overrule this point of error.

### III. Issue Two

The Bollners contend that the trial court erred in awarding attorney's fees to Fairfield, pursuant to the UDJA. The Bollners do not challenge the trial court's determination that the fees were reasonable and necessary or that they were equitable and just, but rather challenge Fairfield's right to recover under the statute. The availability of attorney's fees under a particular statute is a question of law, which is reviewed *de novo*. *Time Out Grocery v. Vanguard Group, Inc.*, 187 S.W.3d 41, 42 (Tex. App.--Dallas 2005, no pet.).

19

The Bollners make two arguments. First, they first argue that they did not sue Fairfield for a declaratory judgment. They claim that the language in their Third Amended Petition (the "Petition"), shows that Fairfield was not sued for a declaratory judgment. In the Petition, however, the Bollners broadly request a declaratory judgment. The request is not limited to any particular defendant, nor did the Bollners limit to any defendant their request for attorney's fees under section 37.004 of the Texas Civil Practice and Remedies Code. The Bollners also asserted a breach of contract claim against all Defendants. The claim is likewise not limited to any defendant.

The Bollners were specific with regard to their other claims. For example, in their breach of fiduciary duty and accounting claims, the Bollners specified that the claims were (only) against PST, PSMI, and Ruppman. Conversely, the Bollners asserted fraud, negligent misrepresentation, tortious interference, and conspiracy claims against "Defendants, including Fairfield." The Bollners sought to recover under an aider and abettor liability theory against Fairfield only. The Petition's prayer requested that the Bollners "recover from Defendants, jointly and severally . . . [a] declaration from the Court that Plaintiffs are entitled to their proportionate percentage of all income derived from the use of Present and Future Technology . . . ." Considering that the Petition is specific as to the parties sued for most of the claims, but open-ended with regard to the declaratory judgment claim, the language indicates that Fairfield was among the defendants sued for a declaratory judgment. *See Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 580 (Tex. App.--Houston [14th Dist.] 2004, no pet.) (discrimination claim was brought against both employer and supervisor, where the term "defendants" was used in alleging the claim, whereas the plaintiff's fraud claim was brought specifically against the supervisor).

Both Fairfield and the PST Defendants brought summary judgment motions against the

20

Bollners. The Bollners point to their response to the PST Defendants' motion for summary judgment in which they asserted that their declaratory judgment was proper because "Defendants themselves have raised ambiguity of the contractual arrangements both as an affirmative defense and as a counterclaim." The Bollners contend that Fairfield did not raise ambiguity as an affirmative defense or counterclaim and that this shows that Fairfield was not sued for a declaration. However, the response relied upon by the Bollners only addressed the PST Defendants' motion for summary judgment, not that of Fairfield, and it defines the use of the term "Defendants," as used in the response, as being PST, PSMI, and Ruppman.[15] Accordingly, the Bollners' argument in this regard is without merit.

The Bollners' second argument is that Fairfield was not entitled to recover attorney's fees, because Fairfield's counterclaim for declaratory judgment merely sought to recover attorney's fees. We agree with the Bollners that, since Fairfield's counterclaim sought merely attorney's fees, it is not entitled to attorney's fees under its own counterclaim. *See Fowler v. Resolution Trust Corp.*, 855 S.W.2d 31, 37 (Tex. App.--El Paso 1993, no writ) (attorney's fees not available for a declaratory judgment claim that seeks the resolution of disputes already before the court). However, Fairfield's claim is based on the Bollners' having brought an unsuccessful declaratory judgment action against it. Under the Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. An award of attorney's fees is not limited to the plaintiff or the party seeking declaratory relief. *Hartford Cas. Ins. Co. v. Budget*

---

[15] Without even reaching the question of whether Fairfield was legally obligated to assert ambiguity of the Bollners' petition as an affirmative defense, in order to maintain its claim for attorney's fees under the UDJA, we note that the Bollners' assertion that Fairfield did not do so is factually doubtful. In its Amended Answer and Counterclaim, Fairfield pleaded that it "asserts and incorporates herein by reference any and all affirmative defenses alleged by Plastic Solutions of Texas, Inc., Plastic Solutions Molding, Inc. and Kurt Ruppman, Sr. in their answers on file in this case."

21

*Rent-A-Car Sys., Inc.*, 796 S.W.2d 763, 771 (Tex. App.--Dallas 1990, writ denied). Moreover, because the Bollners had already invoked the Act, Fairfield was entitled to assert a claim for declaratory relief and attorney's fees. *First City Nat'l Bank v. Concord Oil Co.*, 808 S.W.2d 133, 138 (Tex. App.--El Paso 1991, no writ). Accordingly, Fairfield was entitled to recover its attorneys' fees under the Act.[16]  We overrule this issue.

We affirm the judgment of the trial court.

KENNETH R. CARR, Justice

June 27, 2008

Before Chew, C.J., McClure, and Carr, JJ.

---

[16] The trial court determined that Fairfield was entitled to $77,000 in attorney's fees and $5,271 in trial court costs (plus post-judgment interest). While the Bollners have challenged Fairfield's right to recover any amount in attorney's fees, they have not challenged the reasonableness or necessity of the amount awarded. Payment of any amount of this award by Quick shall constitute a credit toward satisfying the award against the Bollners in this case.