# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-08-00219-CV

**Senna Hills, Ltd. and HBH Development Company, LLC, Appellants**

**v.**

**Sonterra Energy Corporation, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NOS. D-1-GN-05-001625 & D-1-GN-05-001526,
HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment issued July 3, 2009, and substitute the following opinion in place of the earlier one.

Appellants Senna Hills, Ltd. ("Senna") and HBH Development Company, LLC ("HBH") (collectively, the "Developers") brought suit against appellee Sonterra Energy Corporation ("Sonterra") for breach of contract. Sonterra currently owns and operates a propane distribution system located on the Developers' properties. Pursuant to an agreement between the Developers and Sonterra's predecessor in interest, the Developers agreed to encumber the properties with a public-utility easement for the installation and operation of the propane distribution system in return for the right to receive "easement-use fees." By their suits, the Developers asserted a continuing

right to receive the fees from Sonterra and challenged the validity of the assignment of the propane distribution system to Sonterra in light of its refusal to continue making the easement-use fee payments. The trial court granted summary judgment for Sonterra.

The Developers raise five issues on appeal. In issues one and two, they complain that the trial court erred in granting Sonterra's no-evidence motion for summary judgment with respect to the Developers' claim for reformation of the written agreement based on mutual mistake. By their third and fourth issues, they argue that the trial court erred in granting Sonterra's traditional summary-judgment motion as to their failure-of-assignment claims owing to their alleged third-party beneficiary status. In their fifth issue, the Developers contend that the trial court erred in determining that there was no ambiguity in the agreement and in granting summary judgment for Sonterra regarding their claims for breach of contract. We will affirm the summary judgments in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 1997, Senna and the Southern Union Company executed a letter agreement granting Southern Union "the right to install, own, and operate a propane distribution system" in the Senna Hills subdivision. As consideration for Southern Union's installation and operation of the propane system, Senna agreed to file a restrictive covenant in the deed records for the affected lots requiring buyers to pay Southern Union a gas service fee for every lot purchased. Senna further agreed to provide Southern Union with an easement "sufficiently restricting the use of the lot such that the installation and operation of the propane storage tank will not be inconsistent with or impaired by any permitted use of the property." In return, the parties agreed that Southern Union

2

would pay Senna an easement-use fee based on a fixed percentage of Southern Union's gross revenues from propane gas sales. The agreement further stated: "Except as provided below, Developer's right to receive an Easement Use Fee shall continue for so long as the Propane System is a propane system and the Propane System is owned by Southern Union."

With respect to a possible sale of the system by Southern Union, the agreement provided that Southern Union had the right "to transfer and assign, in whole or in part, all and every feature of its rights and obligations under this Letter Agreement and in the Propane System." In the event of such transfer,

> Southern Union shall be released from any further obligation under this Letter Agreement and Developer agrees to look solely to Southern Union's successor for the performance of such obligations. Southern Union agrees to require any assignee to assume full responsibility for all Southern Union's rights and obligations hereunder.

The following year, HBH and Southern Union executed a substantially similar agreement regarding Southern Union's construction and operation of a propane distribution system in HBH's subdivision, Austin's Colony Phase II. This letter agreement contained identical provisions to those quoted above in the Senna–Southern Union agreement regarding the payment of easement-use fees to HBH as Developer and the assignment of Southern Union's rights and obligations under the agreement.[1]

---

[1] For convenience, we will refer to the Senna–Southern Union and HBH–Southern Union letter agreements collectively as the "Propane Service Agreements."

3

On or about January 1, 2003, Southern Union transferred its interests in the propane distribution system to ONEOK Propane Distribution Company ("ONEOK"). After ONEOK had begun operating the system, the Developers filed suit against ONEOK and Southern Union for breach of contract, asserting that ONEOK had failed to pay the easement-use fees due under the Propane Service Agreements and that Southern Union had failed to require ONEOK to assume the obligation to pay the fees. Alternatively, the Developers pleaded that ONEOK's failure to pay the easement-use fees terminated its right to occupy the premises owned by the Developers and all rights and interests in the propane distribution system, and that ONEOK had been unjustly enriched by its operation of the propane distribution system without compensation to the Developers. The parties filed cross-motions for summary judgment, which were pending before the trial court when ONEOK transferred the propane distribution system to Sonterra on October 1, 2004.

Thereafter, the Developers, Southern Union, and ONEOK executed a Settlement Agreement and Release, pursuant to which the parties non-suited their claims in the underlying lawsuit. Under the Settlement Agreement, Southern Union agreed to pay $4,096.06 each to Senna and HBH, and ONEOK agreed to pay $52,642 to Senna and $57,847 to HBH. The Settlement Agreement recited that the foregoing payments

> represent payment in full of (i) easement use fees . . . and satisfaction of all obligations through October 1, 2004, due under that certain Propane Service Letter Agreement dated January 28, 1997, between Senna and SU, and that certain Propane Service Letter Agreement dated September 10, 1998, between HBH and SU, (collectively, the "Propane Agreements"), and (ii) attorneys' fees incurred by Senna and HBH.

4

The Settlement Agreement further provided that it did not constitute "a release, discharge and covenant not to sue by any party to this Agreement of Sonterra" or its affiliates, and that "Senna and HBH warrant and represent that any future lawsuit against Sonterra will be for acts and events that occurred after the assignment by ONEOK Propane to Sonterra." Sonterra was neither a party to that lawsuit nor a signatory to the Settlement Agreement.

Following the assignment of the system from ONEOK to Sonterra and the settlement of the Developers' suits against Southern Union and ONEOK, the Developers filed suit against Sonterra for breach of the Propane Service Agreements based on its refusal to pay easement-use fees. The Developers also asserted that, as a result of Sonterra's alleged breach, they were entitled to judgment terminating and rescinding any rights of Sonterra under the Propane Service Agreements to possession or use of the propane distribution system, as well as a writ of possession and eviction of Sonterra from their properties. In addition, they brought a cause of action for reformation of the Propane Service Agreements, arguing that the parties executing the agreements had intended that, "in the event Southern Union assigned the Propane Service Agreements, its assignee would be responsible for payment" of the easement-use fees. Therefore, the Developers argued, "[if] this intent did not get reduced to writing in the Propane Service Agreements, it was as a result of accident, including scribner [sic] error, or mutual mistake."

The Developers also challenged the assignment of the propane distribution system to Sonterra, arguing that the requirement in the Propane Services Agreement "that assignees assume obligations thereunder" was a restriction on transfer or a condition to the effectiveness of the assignment that had not been satisfied. As alternative grounds for relief, the Developers sought a

5

right to recover a "developer bonus" under the Propane Service Agreements and additional damages under principles of equity and implied contract. Finally, the Developers argued that they were intended third-party beneficiaries of the Asset Purchase Agreement between ONEOK and Sonterra and, as a result, they could sue to enforce Sonterra's obligations under that instrument, which, they maintained, included the obligation to continue to pay easement-use fees pursuant to the terms of the Settlement Agreement between the Developers, Southern Union, and ONEOK.

Sonterra moved for summary judgment regarding Sonterra's breach-of-contract and failure-of-assignment claims and for partial summary judgment seeking dismissal of the Developers' claim for reformation. The Developers also moved for summary judgment on all claims. The trial court denied the Developers' motions and Sonterra's partial summary-judgment motion, but granted Sonterra's motion for summary judgment "in part with respect to Plaintiff's breach of contract claim and failure of assignment claim based upon Defendant's failure to pay easement use fees," finding that the "disputed contract language is unambiguous."

After further proceedings, Sonterra again moved for summary judgment on both traditional and no-evidence grounds. In its no-evidence motion, Sonterra sought summary judgment as to the Developers' claims for reformation, arguing that there was no evidence of mutual mistake and that the Developers had not met their burden of showing either that Sonterra had notice of the mutual mistake or that Sonterra was not a bona fide purchaser. In response to the motion, the Developers presented the affidavit of Rip Miller, president of the general partner of Senna and manager of HBH. Miller averred that he intended, in the event that Southern Union assigned the Propane Service Agreements, for Southern Union's assignees to be responsible for payment of the

6

easement-use fees; that he understood this to be the intent of Don Scovil, who negotiated the Propane Service Agreements on behalf of Southern Union; and that he did not intend any language in the agreements to negate the requirement for Southern Union's assignees to assume full responsibility for Southern Union's obligations, including payment of the easement-use fee. Miller further stated that if the written document did not accurately reflect this intent, such error was a mistake in reducing to writing the parties' agreement. The Developers also presented Scovil's December 2005 deposition testimony, wherein he stated that it was his intent, in negotiating the Propane Service Agreements, that in the event of a transfer, the new buyer of the propane distribution system would be responsible for paying easement-use fees.[2]

---

[2] Scovil testified as follows:

Q. Can you tell us whether or not you agreed with Mr. Miller on behalf—you acting on behalf of Southern Union, he acting on behalf of HBH and Senna Hills, that if Southern Union were to sell the systems, that whoever bought them would continue to be responsible for and would continue to pay the Easement Use Fee?

A. Yes. The agreement—what also then relieves Southern Union of it's [sic] obligation to pay Easement Use Fees because the property was then assigned and sold to someone else.

Q. And to your understanding was your agreement that the new buyer would be responsible for those fees; can you state whether or not that was your understanding?

A. Yes, that was my intent.

Scovil further testified that he instructed the Southern Union attorney who drafted the Propane Service Agreements, "I want a provision in there that, you know, if the system was ever sold, [then] the [easement] use fees would continue."

In its rule 166a(c) motion, Sonterra raised the following summary-judgment grounds: (1) the court's prior ruling that the Propane Service Agreements were unambiguous as a matter of law precluded the Developers from establishing a mutual-mistake claim; (2) even if the Developers could establish a mutual-mistake claim, they could not seek reformation of the Propane Service Agreements against Sonterra because Sonterra was a bona fide purchaser without notice of mutual mistake; (3) the Settlement Agreement between the Developers, Southern Union, and ONEOK did not create an obligation for Sonterra to pay the Developers easement-use fees; (4) Sonterra was not required to pay the Developers a developer's bonus; and (5) ONEOK's assignment of the Propane Service Agreements to Sonterra was valid.

The trial court granted Sonterra's no-evidence motion "with respect to Plaintiffs' claims of mutual mistake," and its traditional motion as to Plaintiffs' claims (1) "based upon the Asset Purchase Agreement and Settlement Agreement," (2) "based upon Failure of Assignment," and (3) "seeking a developer bonus arising from ONEOK's sale of the propane system to Sonterra." After the trial court granted the parties' agreed motion to dismiss all remaining claims and counterclaims, the Developers perfected this appeal.

**STANDARDS OF REVIEW**

A movant seeking traditional summary judgment on its own cause of action or affirmative defense has the initial burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its cause of action or affirmative defense. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). If the movant meets this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding

8

summary judgment. *See id.* In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

A no-evidence summary judgment is essentially a pretrial directed verdict, which we review under a legal-sufficiency standard. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750 (Tex. 2003). When a party moves for a no-evidence summary judgment under rule 166a(i), he must assert that, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i); *see Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). A no-evidence summary judgment is improper if the nonmovant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Tex. R. Civ. P. 166a(i). More than a scintilla of evidence exists when the evidence presented rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We review the evidence in the light most favorable to the nonmovant and disregard all contrary evidence and inferences unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

9

## DISCUSSION

*Ambiguity in Propane Service Agreements*

Because our construction of the Propane Service Agreements necessary to resolve the Developer's fifth issue affects our analysis of their other issues, we will address the fifth issue first. By their fifth issue, the Developers argue that the trial court erred in granting Sonterra's first motion for summary judgment on the basis that the Propane Service Agreements were not ambiguous. In its motion, Sonterra asserted that it was entitled to judgment as a matter of law as to the Developers' claims for breach of contract and failure of assignment because the Propane Service Agreements unambiguously provided that the Developers' right to receive easement-use fees would continue only for so long as the propane distribution system was owned by Southern Union, *i.e.*, if and when Southern Union sold the system, the Developers would have no further right to receive any easement-use fees. In so arguing, Sonterra relied on the plain language of the "Easement Use Fee" provision common to both letter agreements, which states: "Except as provided below, Developer's right to receive an Easement Use Fee shall continue for so long as the Propane System is a propane system and the Propane System is owned by Southern Union."

Sonterra asserted that this clause defeated the Developers' claims because, once Southern Union assigned the system to ONEOK, "there was no longer an obligation to pay easement use fees within the Agreement that was assignable," and therefore ONEOK "could not, and did not, assign any obligation to pay easement use fees due under the Agreement when it assigned it to Sonterra." The Developers, on the other hand, urge that the Easement Use Fee provision must be

read in conjunction with the later provision entitled "Assignments," which provides that, in the event of transfer:

> Southern Union shall be released from any further obligation under this Letter Agreement and Developer agrees to look solely to Southern Union's successor for the performance of such obligations. Southern Union agrees to require any assignee to assume full responsibility for all Southern Union's rights and obligations hereunder.

Therefore, the Developers argue, the requirement to pay easement-use fees as set forth in the first provision is an "obligation" that Southern Union's assignee must assume in accordance with the second provision. In light of this construction, the Developers maintain that the Propane Service Agreements are ambiguous because they are susceptible to more than one reasonable interpretation: either the system owner's obligation to pay the Developers easement-use fees continued post-assignment and was assumed by the assignee, as they argue, or any and all right to receive the fee ceased when Southern Union assigned the system, as Sonterra asserted. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) ("[A] contract is ambiguous if it is susceptible to more than one reasonable interpretation."). Accordingly, the Developers maintain that the trial court erred in finding that the Propane Service Agreements were not ambiguous and that the order granting Sonterra's motion for summary judgment must be reversed.

Deciding whether a contract is ambiguous is a question of law for the court. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). In construing a written agreement, we first determine whether it is possible to enforce the contract as it is written. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). In so doing, we must ascertain and give effect to the

11

parties' intentions as expressed in the document. *Id.*; *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Webster*, 128 S.W.3d at 229. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Webster*, 128 S.W.3d at 229. Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties as expressed in the contract. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (citing *National Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995)). Because we conclude that the contract language here can be given a definite legal meaning and is not susceptible to more than one reasonable meaning, we hold that it is unambiguous.

Read together, the "Easement Use Fee" and "Assignments" provisions of the Propane Service Agreements reflect an intent to accomplish two related but distinct goals regarding the payment of easement-use fees. First, by declaring that the Developers' right to receive easement-use fees "shall continue for so long as the Propane System is a propane system and the Propane System is owned by Southern Union," the Easement Use Fee provision released Southern Union from any further obligation to pay easement-use fees in the event that it no longer owned the propane distribution system. This intent is also echoed in the Assignments provision, which states that

12

"Southern Union shall be released from any further obligation under this Letter Agreement and Developer agrees to look solely to Southern Union's successor for the performance of such obligations."

Second, the Propane Service Agreements reveal an intent to allow the Developers to continue receiving easement-use fees in the event of an assignment of the propane distribution system. To that end, the Assignments provision sets forth that "Southern Union agrees to require any assignee to assume full responsibility for all Southern Union's rights and obligations hereunder"—including, as the Developers point out, the obligation to pay easement-use fees. We therefore reject Sonterra's position that the Propane Service Agreements unambiguously terminated the Developers' right to receive any and all future easement-use fee payments when Southern Union transferred the system. But, contrary to the Developers' interpretation, the Propane Service Agreements themselves do not *directly* bind Southern Union's assignee to make the easement-use payments; rather, the agreements obligate *Southern Union* to require its assignee to agree to an assumption of Southern Union's obligations under the Propane Service Agreements, including the responsibility for payment of the easement-use fees. Put differently, while the Propane Service Agreements evidence an intent for the Developers to continuing receiving easement-use fees, those agreements do not, themselves, directly impose an obligation on any future assignee to pay the fees. Instead, the agreements made it Southern Union's responsibility to require its assignee to take on the obligation to pay easement-use fees, which in this case means that Southern Union was obligated

13

to require ONEOK to assume all of Southern Union's obligations under the agreements, including the obligation to pay easement-use fees.[3]

Thus, by their plain language, the Propane Service Agreements imposed two distinct obligations on Southern Union regarding payment of easement-use fees: (1) to pay easement-use fees to the Developers for as long as it owned the propane distribution system, and (2) to require its assignee to assume all of its contractual obligations, including the obligation to pay the easement-use fees to the Developers. The provisions setting forth these obligations are not in conflict with one another and do not impose inconsistent obligations. They neither mandate permanent termination of the Developers' right to receive easement-use fees in the event Southern Union transferred ownership of the system, nor do they create a direct obligation for the assignee of the system to pay the fees due.

The Developers' assertion that the Propane Service Agreements are ambiguous is premised on their erroneous conflation of the duties that the agreements imposed on Southern Union and the obligation that the agreements contemplate—but do not themselves require—for an assignee. To the extent that an assignee would have an obligation to pay easement-use fees, such obligation must arise under some other instrument (*e.g.*, the agreement between Southern Union and ONEOK, which we note is not a part of the appellate record). The Propane Service Agreements themselves, however, do not support the Developers' claims for breach of contract against the assignee of the propane distribution system.

---

[3] The Developers apparently recognized that the Propane Service Agreements so required, as they initially asserted a breach-of-contract claim against Southern Union for failing to require ONEOK to assume the obligation to pay the fees.

14

Because the Propane Service Agreements are not ambiguous, and because they do not, themselves, obligate Sonterra to pay easement-use fees to the Developers, the trial court did not err in granting Sonterra's first motion for summary judgment with respect to the Developers' claims for breach of contract. We overrule the Developers' fifth issue.

### Mutual Mistake

In their first issue, the Developers argue that the trial court erred in granting Sonterra's no-evidence motion for summary judgment because the evidence raised a fact issue as to their claim of mutual mistake. As a preliminary matter, we first address the Developers' complaints regarding the sufficiency of Sonterra's motion.

On appeal, the Developers argue that Sonterra's motion was incurably defective because it failed to specify the elements as to which there was no evidence. We first note that the Developers did not contest the adequacy of the motion to the trial court. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342-43 (Tex. 1993) (holding that in order for nonmovant to complain on appeal that grounds raised in motion for summary judgment were unclear, nonmovant must file exception to motion); *Lochabay v. Southwestern Bell Media, Inc.*, 828 S.W.2d 167, 170 n.2 (Tex. App.—Austin 1992, no writ) (same). Assuming without deciding that the Developers preserved their complaint as to the sufficiency of the motion in such circumstances, we conclude that the motion was sufficiently specific as to the elements that Sonterra challenged on no-evidence grounds.

By their third amended petition, after the trial court had partially granted Sonterra's motion for summary judgment as to their breach-of-contract claims, the Developers asserted a cause

15

of action for reformation of the Propane Service Agreements. Specifically, they pleaded that the parties to the Propane Service Agreements intended for Southern Union's assignee to be responsible for payment of the easement-use fees, and if this intent did not get reduced to writing in the Propane Service Agreements, "it was a result of accident, including scribner [sic] error, or mutual mistake, made after the original agreement." The Developers thus sought "reformation of the Propane Service Agreement to conform to the parties' intent." Reformation requires two elements: (1) an original agreement and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing. *Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex. 1987); *Bollner v. Plastics Solutions of Tex., Inc.*, 270 S.W.3d 157, 169 (Tex. App.—El Paso 2008, no pet.).

Sonterra's motion asserts that the Developers presented no evidence of mutual mistake. Mutual mistake is an essential element of reformation, *see Cherokee Water*, 741 S.W.2d at 379, a claim on which the Developers would have the burden of proof at trial, *see* Tex. R. Civ. P. 166a(i) (no-evidence motion must state elements of claim or defense on which adverse party would have burden of proof at trial and as to which there is no evidence). Therefore, Sonterra's motion satisfied rule 166a(i) and was properly before the trial court for its consideration.

In arguing that its summary-judgment evidence raised a fact issue as to mutual mistake, the Developers point to Miller and Scovil's testimony to the effect that both parties intended for the easement-use fees to continue if the system was ever assigned. As we have explained above, however, that intent was in fact expressed in the Propane Service Agreements as written. The language of the agreements is consistent with the evidence on which the Developers rely in their attempt to establish mutual mistake. In his deposition, Scovil stated, "[T]here was a provision in the

16

contract that if Southern Union sold [the system], then the assignee would be responsible for paying the Easement Use Fees." He further testified that he intended "on the assignments [provision] . . . to provide a way where Southern Union could sell it's [sic] system, or the developer could sell it's [sic] system" and "accordingly, Southern Union would have the ability to sign [sic] all of its rights and obligations to whoever purchased the system," including the payment of easement-use fees to the Developers; that he did not intend to relieve any person who acquired the system from Southern Union of the obligation to pay the easement-use fees; and that the purpose of the "Easement Use Fee" paragraph was "to establish no recourse" against Southern Union "in the event that a person who purchase[d] the system defaulted." Miller's affidavit expressed a similar intent.

According to the evidence, the parties made no mistake in preparing and drafting the Propane Service Agreements. The agreements, by their plain language, accomplish what the contracting parties testified that they intended the agreements to do: (1) create an obligation for Southern Union to pay easement-use fees to the Developers as long as Southern Union owned the system, and (2) create a mechanism by which the Developers would continue to receive easement-use fees after any sale of the system by Southern Union. What the Developers now urge is that *the agreements themselves* directly obligate—or were intended to obligate—an assignee of the system to pay the Developers easement-use fees. That position, however, is simply not supported by the unambiguous terms of the Propane Service Agreements. Because the "Assignments" provision as it is written satisfies the parties' stated intentions regarding the "continuing" nature of easement-use fee payments, we decline to enlarge that provision to impose an affirmative obligation on the assignee. *See Clemmens v. Kennedy*, 68 S.W.2d 321, 324 (Tex. Civ. App.—Texarkana 1934,

17

writ ref'd) (holding that court had no power to change contract actually made and truly embodied in written instrument on basis of reformation when evidence showed that parties made no mistake in preparing or drafting deed). Accordingly, we hold that the Developers were not entitled to reformation of the Propane Service Agreements and overrule the Developers' first issue.

### Bona Fide Purchaser

In their second issue, the Developers argue that, "if the trial court's March 18, 2008 order is construed to include Sonterra's no-evidence ground '(2)' as to the bona fide purchaser issue, then the trial court erred in granting Sonterra's no-evidence motion on such ground."[4] Having determined that Sonterra's no-evidence motion seeking judgment as a matter of law on the Developers' reformation action was properly granted on the basis that the Developers had presented no evidence of mutual mistake, we need not address the other grounds raised in Sonterra's motion. *See Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 223 (Tex. 2003); *see also* Tex. R. App. P. 47.1. We overrule the Developers' second issue.

### Third-Party Beneficiary Claims

By their third issue, the Developers argue that the trial court erred in granting Sonterra's motion for summary judgment as to their third-party beneficiary claims arising under the Asset Purchase Agreement between ONEOK and Sonterra and the Settlement Agreement between the Developers, Southern Union, and ONEOK. The Developers pleaded that, as third-party

---

[4] The trial court's order granting Sonterra's motion states, "Defendant's No Evidence Motion for Summary Judgment with respect to Plaintiffs' claims of mutual mistake in both [cause numbers] is hereby GRANTED."

18

beneficiaries, they could sue Sonterra under those agreements, which they argued entitled them to the continued payment of easement-use fees.

As discussed previously, ONEOK transferred the propane distribution system to Sonterra while the Developers' suits against ONEOK and Southern Union were still pending. The Asset Purchase Agreement contained provisions that spoke to the ongoing litigation between these parties. Specifically, the Asset Purchase Agreement provided in section 6.4(c):

> In the event final adjudication or settlement of either or both of the Austin's Colony Matter and the Senna Hills Matter results in the easement use fee obligation continuing under either or both of the developer agreements at issue in these matters, [Sonterra] agrees to enter into any amendment to the developer agreements or new developer agreements as necessary that requires [Sonterra] to pay easement use fees subsequent to the Effective Date on the same terms and conditions as the existing developer agreements.

The Developers argue on appeal that the Settlement Agreement executed by the Developers, Southern Union, and ONEOK "results in the easement use fee obligation continuing" because, pursuant to the settlement, Southern Union and ONEOK paid all easement-use fees due from them to the date of ONEOK's transfer of the system to Sonterra. The Settlement Agreement stated that Southern Union and ONEOK agreed to pay certain sums to the Developers as "payment in full of (i) easement use fees" and (ii) attorney's fees in "satisfaction of all obligations through October 1, 2004." Thus, the Developers maintain, Sonterra was required under the Asset Purchase Agreement either to amend the Propane Service Agreements or to enter into new developer agreements so that it would be required to pay easement-use fees "subsequent to the Effective Date" of the transfer of ownership of the propane distribution system. The Developers further argue that,

19

because the only existing "developer agreements at issue in this matter" were with them—Senna and HBH—this provision of the Asset Purchase Agreement must be interpreted to mean that they are third-party beneficiaries of that agreement and can sue to enforce Sonterra's obligations thereunder.

Sonterra responds that the Developers cannot assert breach-of-contract claims against it under the Settlement Agreement because Sonterra was not a party to the settlement and did not expressly agree to any of the obligations that the Settlement Agreement allegedly created. Similarly, Sonterra argues that the Developers cannot assert such claims under the Asset Purchase Agreement because they were neither parties to that agreement, nor were they intended third-party beneficiaries. With respect to the Developers' claims arising under the Asset Purchase Agreement, Sonterra further argues that even if the Developers could be considered third-party beneficiaries under that agreement, the easement-use fee obligation did not "continue" as a result of the Developers' settlement with Southern Union and ONEOK, so section 6.4(c) of the Asset Purchase Agreement was not triggered.

Our analysis of the third-party beneficiary issue, which is governed by well-established principles of contract interpretation, turns on our analysis of these agreements. *See MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). In the past ten years, the Texas Supreme Court has written at least three times on the subject of third-party beneficiaries. Those opinions provide guidance for the present case:

> A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit.

To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefited only incidentally by the performance of, the contract. . . .

In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. A court will not create a third-party beneficiary contract by implication. The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.

*Id.* at 651 (citations omitted); *accord South Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007); *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006); *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002).

Applying these principles here, we must first determine whether the Asset Purchase Agreement evidences an intent on the part of ONEOK and Sonterra to secure some direct benefit for the Developers, thus allowing the Developers to enforce that agreement even though they were not parties to it. *See MCI*, 995 S.W.2d at 651. If we determine that ONEOK and Sonterra did so intend, we then consider whether the settlement of the Developers' suits against Southern Union and ONEOK resulted in the easement-use fee obligation "continuing" under the Propane Service Agreements, thereby triggering an obligation on the part of Sonterra that the Developers could seek to enforce.

Sonterra argues initially that recognizing the Developers' third-party rights under the Asset Purchase Agreement would be inconsistent with section 11.14 of the agreement, which is entitled "No-Third Party Beneficiaries" and provides as follows: "Except as otherwise provided in this Agreement, nothing contained in this Agreement shall entitle anyone other than Seller [ONEOK]

21

or Buyer [Sonterra] or their authorized successors and assigns to any claim, cause of action, remedy or right of any kind whatsoever." While this provision is certainly evidence of the contracting parties' intent, we cannot ignore the clause *"[e]xcept as otherwise provided in this Agreement . . . ."* In its recent third-party beneficiary cases, the supreme court has emphasized that in determining the parties' intent, "we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *Id.* at 652; *accord Stine*, 80 S.W.3d at 589. The mere inclusion of a provision expressly disavowing third-party beneficiaries is not dispositive and must be read in concert with other contractual provisions acknowledging the rights of third parties. *See MCI*, 995 S.W.2d at 652. Accordingly, we must examine the entire agreement to see if a different intent is "otherwise provided" therein.

As discussed above, section 6.4 of the Asset Purchase Agreement, which appears under the heading "**PRE-CLOSING CONDUCT AND COVENANTS**," contains a series of provisions concerning the litigation involving Austin Colony and Senna Hills. It states that, after closing, Sonterra would assume all liability for the Austin's Colony and Senna Hills matters and ONEOK would be entitled to any recoveries, collections of money, judgments, or other benefits relating to the litigation. Further, it provides that if the final adjudication or settlement of either or both of the Austin's Colony Matter and the Senna Hills Matter results in the easement-use fee obligation continuing under either or both of the developer agreements at issue in these matters, Sonterra must "enter into any amendment to the developer agreements or new developer agreements as necessary that requires [it] to pay easement use fees subsequent to the Effective Date on the same terms and conditions as the existing developer agreements." For the reasons that follow, we agree

22

with the Developers that this language in section 6.4 of the Asset Purchase Agreement provides for third-party benefits in their favor and thus recognizes the sort of exception contemplated by section 11.14.

"To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefited only incidentally by the performance of, the contract." *MCI*, 995 S.W.2d at 651. One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation, while a creditor beneficiary is one to whom performance will come in satisfaction of a legal duty owed to him by the promisee. *Id.* This duty may be an indebtedness, contractual obligation, or other legally enforceable commitment owed to the third party. *Id.*; *see Stine*, 80 S.W.3d at 589.

The Developers argue that they are creditor beneficiaries because the Asset Purchase Agreement identifies them by reference to the ongoing Austin's Colony and Senna Hills litigation, recognizes an obligation that would inure to their benefit, and binds Sonterra to perform that obligation. Sonterra responds that, like the contract at issue in *MCI*, which was held not to confer third-party beneficiary status on the claimant, the Asset Purchase Agreement fails to indicate that the contract between it and ONEOK was entered into for the Developers' direct benefit. Evidence of any intent to confer a benefit on the Developers is lacking, Sonterra maintains, because "the Developers are never even mentioned anywhere in the document and nothing therein is commensurate with a statement that the [Asset Purchase Agreement] 'inured to the benefit of the Developers.'"

23

Although some cases involving third-party beneficiary issues have pointed out when a contract does or does not identify a would-be third-party beneficiary by name, *see Lomas*, 223 S.W.3d at 306, or when a contract expressly states that it "inures to the benefit" of the third party, *see Palm Harbor Homes*, 195 S.W.3d at 677, the Texas Supreme Court has never held that these are requirements that must be satisfied before a party can be deemed a third-party beneficiary. On the contrary, the supreme court has indicated that an intended third-party beneficiary need *not* be specifically named, so long as the intent to benefit him is clear. *See Knox v. Ball*, 191 S.W.2d 17, 23-24 (Tex. 1945); *see also MCI*, 995 S.W.2d at 651-52 (deciding issue based not on fact that contract failed to identify third party by name among class of licensees whose rights were acknowledged in contract, but because contract did not evidence intent to provide party with any direct benefit).

Put another way, the requisite intent to confer third-party beneficiary status is manifest if express reference is made to the contracting parties' obligation to a specific third party and it is unmistakable that the contracting parties contemplated conferring on the third party the right to enforce the obligation. *Union Pac. R.R. Co. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 422 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see* Restatement (2d) of Contracts § 302(1) (1981) ("[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."). Here, section 6.4 of the Asset Purchase Agreement (1) acknowledges the

24

easement-use fee obligation contained in the existing Propane Service Agreements and (2) obligates Sonterra to agree to pay easement-use fees "on the same terms and conditions" as the existing agreements in the event that the easement-use fee obligation is "continuing" after the final adjudication or settlement of the Developers' claims. While this provision does not name "Senna" or "HBH," it does specifically refer to their right to receive easement-use fees in "the Austin's Colony Matter and the Senna Hills Matter . . . on the same terms and conditions as the existing developer agreements." We find Sonterra's attempts to argue that this provision "does not actually refer to 'the developers' at all" to be contrary to the plain meaning of the agreement. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (we construe contracts in common-sense fashion, giving terms their plain and ordinary meaning).

Nor are we persuaded by Sonterra's arguments that because the Asset Purchase Agreement, by and large, pertains to contractual dealings allocating liability between it and ONEOK, it cannot be interpreted to have been made for the benefit of the Developers as third-party beneficiaries. "[A] third-party beneficiary does not have to show that the signatories executed the contract solely to benefit her as a non-contracting party. Rather, the focus is on whether the contracting parties intended, at least in part, to discharge an obligation owed to the third party." *Stine*, 80 S.W.3d at 591. The Asset Purchase Agreement, like the contract at issue in *Stine*, was obviously not for the Developers' sole benefit. Yet we cannot overlook those provisions in the agreement that expressly state that the payment of easement-use fees is an obligation that Sonterra must perform, simply because the larger purpose of the agreement was unrelated to that obligation. *Cf. id.* at 588, 590-91 (recognizing that purpose of agreement was to dispose of contracting parties'

25

marital property but recognizing third-party rights of nonsignatory when agreement acknowledged obligation to third party and directed parties to apply proceeds from sale of property to that debt).

Although conditioned on the outcome of ONEOK and Southern Union's settlement and whether that results in the easement-use fee obligation "continuing," Sonterra's obligation itself is unambiguous: Sonterra must enter into an agreement, or amend the existing agreements assigned to it, requiring it to pay easement-use fees. Sonterra does not argue, nor does the relevant case law suggest, that the mere inclusion of such a triggering condition will obviate the clear intent of the contracting parties to create an obligation for the benefit of third parties. *See, e.g.*, *In re Golden Peanut Co., LLC*, 269 S.W.3d 302, 313-14 (Tex. App.—Eastland 2008, no pet.) (court determined that plaintiff spouse was intended third-party beneficiary of agreement between decedent husband and his employer, but held that whether parties to agreement intended it to include wrongful-death claim by surviving spouse was fact question; "This holding is without prejudice to the parties' right to pursue the arbitration agreement's application to [plaintiff] as a third-party beneficiary further in the trial court.").[5]

---

[5] *Stine v. Stewart* is also instructive on this point. 80 S.W.3d 586 (Tex. 2002). The agreement at issue in that case, like the agreement here, phrased the parties' obligation to the third party conditionally: "*if* Stewart sold [the property], he agreed that *any monies owing* to Stine are to be paid in the current principal sum of $50,000." *Id.* at 588 (emphases added). The court of appeals had held that Stine was not a third-party beneficiary because the agreement did not "clearly and unequivocally" acknowledge the debt owed to Stine and, therefore, did not express Stewart's willingness to pay any debt. *Id.* at 589. Reversing, the supreme court determined that the acknowledgment of the debt and reference to the unpaid principal sum were sufficient evidence of Stewart's intent, by the agreement, to confer a benefit on Stine and held that Stine could sue to enforce the agreement even though she was not a signatory to it, in the event that the property was sold. *Id.* at 590-91. Likewise, the agreement in our case premised Sonterra's obligation upon some future event.

26

In order to "harmonize and give effect to all provisions of the contract so that none will be meaningless," *see MCI*, 998 S.W.2d at 652, we must interpret section 6.4(c) as an exception "provided in this Agreement." Because we cannot read section 11.14 to negate the rights conferred by section 6.4(c) on the Developers, we hold that they are intended third-party beneficiaries of the Asset Purchase Agreement.

Accordingly, we now turn to the question of whether the "settlement of either or both of the Austin's Colony Matter and the Senna Hills Matter result[ed] in the easement use fee obligation continuing under either or both of the developer agreements at issue in these matters," *i.e.*, the Propane Service Agreements. If it did not, as Sonterra maintains, then Sonterra was under no obligation "to enter into any amendment to the developer agreements or new developer agreements as necessary [requiring it] to pay easement use fees subsequent to [October 1, 2004,] the Effective Date" of the transfer of the system to Sonterra. If, however, the settlement did result in the easement-use fee obligation "continuing," then Sonterra has breached this provision of the Asset Purchase Agreement by failing to enter into the necessary agreements.

We conclude that the language of the Asset Purchase Agreement is ambiguous as to the meaning of "continuing." *See Webster*, 128 S.W.3d at 231 (holding that court may conclude that contract is ambiguous even in absence of such pleading by either party); *Coker*, 650 S.W.2d at 393 (concluding that agreement was ambiguous even though both parties asserted it was unambiguous and moved for summary judgment). A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker*, 650 S.W.2d at 393-94 (citing *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 778 (1962)). In this case, the language concerning

27

whether the easement-use fee obligation is "continuing" as a result of the settlement of the Developers' claims is ambiguous because it is susceptible to at least two different reasonable meanings. In these circumstances, "continuing" could refer to an obligation established from the time the Propane Service Agreements were executed and as part of those agreements—*i.e.*, an obligation that "continued" into the future, past any system transfer, without regard or reference to any other agreement. This is the construction that Sonterra urges, as evidenced by its assertion that "the Settlement Agreement does not in any way claim that the easement use fees 'continue.'" Indeed, for the Settlement Agreement to create a "continuing" obligation beyond the effective date of the system transfer, it would have to create an obligation on the part of Sonterra, which it could not do, as Sonterra was not a party to the settlement.

But "continuing" could also reasonably be construed to mean that if, as a result of the settlement, the Developers were entitled to receive any further easement-use fees after the point in time when Southern Union and ONEOK had asserted that such entitlement ceased—namely, January 1, 2003, when Southern Union transferred the system to ONEOK—then the obligation to make easement-use fee payments could be regarded as "continuing" from the perspective of the Developers. Put differently, since ONEOK had taken the same position that Sonterra adopted in this case—*i.e.*, that the Developers' right to receive easement-use fees ceased forever when Southern Union transferred the system—then an acknowledgment by ONEOK that it did in fact owe easement-use fees to the Developers after the transfer from Southern Union took place could reasonably be understood as a "continuation" of the obligation to pay the fees. Thus, the statements in the Settlement Agreement that ONEOK's payments of $52,642 to Senna and $57,847 to HBH

representing "payment in full" of easement-use fees and satisfaction of all obligations through October 1, 2004, due under the Propane Service Agreements could arguably support a claim that the obligation "continued," thereby triggering Sonterra's obligations under section 6.4(c) of the Asset Purchase Agreement.

In light of this ambiguity, "the granting of a motion for summary judgment [was] improper because the interpretation of the instrument becomes a fact issue." *Coker*, 650 S.W.2d at 394 (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980)). "The trier of fact must resolve the ambiguity by determining the true intent of the parties." *Id.*; *Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex. 1968). We therefore sustain the Developers' third issue on appeal and hold that the trial court erred in granting Sonterra's motion for summary judgment as to the Developers' third-party claims arising under the Asset Purchase Agreement.

### *Failure of Assignment*

By their fourth issue, the Developers argue that the trial court erred in granting Sonterra's second motion for summary judgment with respect to their claims based on failure of the assignment of the system from ONEOK to Sonterra.

In addition to seeking damages for breach of contract, the Developers pleaded that Sonterra's refusal to pay easement-use fees due under the Propane Service Agreements rendered the assignment from ONEOK to Sonterra "ineffective." The Developers premised this complaint on (1) their reading of the "Assignments" provision of the Propane Service Agreements as a restriction on transfer, and (2) their alleged third-party beneficiary status as derived under the Asset Purchase Agreement between ONEOK and Sonterra, which contained the following provision:

Should any of the Assets be subject to a valid consent to assign *or other restriction on transfer* as to which the assignment hereunder would be a breach of such obligation or result in the termination of such Asset(s), then any such Asset(s) shall be *deemed not transferred* hereunder unless and until such consent or other restriction is obtained or waived from or by the third party having such right.

(Emphases added.) Thus, the Developers asserted that, as third-party beneficiaries of the ONEOK–Sonterra Asset Purchase Agreement, they had the right to "enforce the transfer restriction (or transfer voidance) provision" of that agreement. We disagree.

The Assignments provision of the Propane Service Agreements is not a restriction on transfer. It states only that Southern Union has an affirmative obligation "to require any assignee to assume full responsibility for all of Southern Union's rights and obligations" under those agreements. By its own terms, it poses no "restriction" and is silent as to what effect noncompliance with the provision has on the validity of the transfer. *Cf. OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 733 n.3 (Tex. App.—Dallas 2007, pet. denied) (giving effect to restriction on transfer stating that "no Partner shall Transfer all or any portion of its Interest or any rights therein" under certain conditions and that any transfer or attempted transfer in violation of stated conditions "shall be null and void and of no effect whatever").

Moreover, the record contains no evidence that the Developers' consent was required in order to effect transfer of any asset subject to the Asset Purchase Agreement between ONEOK and Sonterra. Thus, to the extent that a "failure of assignment" cause of action even exists under Texas law, the Asset Purchase Agreement does not support recovery under such a theory in this case. As Sonterra points out, the provision on which the Developers rely prevents the transfer of an asset

(1) in the event such transfer would cause a breach or termination of the asset or (2) if the transfer is conditioned upon the consent of a third party and that consent has not been obtained. The Developers' argument regarding Sonterra's "failure and refusal to pay easement-use fees" after ONEOK transferred the system assets does not fall within either of the situations contemplated by this provision.

Furthermore, as we have previously discussed, the Asset Purchase Agreement contains a clause that precludes a third party from asserting claims under the agreement "[e]xcept as otherwise provided in the Agreement." The Agreement, however, contains no provision that confers on any third party the right to challenge the validity of the transfer of the system from ONEOK to Sonterra. "The intent to confer a direct benefit upon a third party 'must be clearly and fully spelled out or enforcement by the third party must be denied.'" *Lomas*, 223 S.W.3d at 306 (quoting *MCI*, 995 S.W.2d at 651). Despite the absence of such intent, the Developers nonetheless argue that the "No Third-Party Beneficiaries" provision *itself* demonstrates "that both Sonterra and ONEOK expressly acknowledged third party beneficiaries in their asset purchase agreement." On the contrary, although the agreement acknowledges that if a third party possesses a right to restrict the transfer of an asset subject to the agreement by withholding its consent, it may do so, it does not, directly or indirectly, confer such a right on any party. *See id.* ("A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit.").

We hold that the trial court properly granted summary judgment in favor of Sonterra on the Developers' failure-of-assignment claims and overrule the Developers' fourth issue.

31

**CONCLUSION**

We reverse the trial court's summary judgment with respect to the Developers' third-party beneficiary claim for breach of the Asset Purchase Agreement, and we remand that portion of the cause to the trial court for further proceedings consistent with this opinion. We affirm the remainder of the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Henson
   Dissenting Opinion by Justice Puryear

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed: January 15, 2010