

NUMBER 13-13-00577-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**FALCON INTERNATIONAL BANK,**                                    **Appellant,**

**v.**

**MARK A. CANTU, ROXANNE PENA CANTU, INDIVIDUALLY, AND CANFLOR, L.P., A TEXAS LIMITED PARTNERSHIP,**                          **Appellees.**

---

### On appeal from the 370th District Court of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

**Before Justice Garza, Benavides and Perkes**
**Memorandum Opinion by Justice Garza**

Following a bench trial in this dispute over a loan agreement, the trial court

rendered judgment in favor of appellees, Mark A. Cantu and Canflor, L.P.[1]  The trial court

---

[1] Together, Cantu and his wife, Roxanne, own 94% of Canflor.

awarded: (1) $375,728, pre- and post-judgment interest, $70,000 in attorney's fees, and contingent appellate attorney's fees to appellees jointly and severally; and (2) $750,000 plus pre-and post-judgment interest to Cantu individually. The trial court also ruled that appellant Falcon International Bank ("Falcon") was entitled to foreclose on the lien property securing the loan, but was prohibited from seeking recovery from appellees for any deficiency on the loan. By six issues, Falcon contends that the trial court: (1) erred in holding that Falcon entered into and breached an oral modification agreement with Cantu[2]; (2) erred in holding that Falcon committed fraud or fraud in the inducement; (3) erred in holding that Falcon owed and breached a fiduciary duty to Cantu; (4) erred in awarding mental anguish damages, exemplary damages, and attorney's fees to Cantu; (5) violated the single satisfaction rule by awarding both tort damages and contract damages for a single alleged injury; and (6) erred in rendering a take-nothing judgment on Falcon's counterclaims and in ordering that Falcon may not seek recovery for any deficiency from Cantu. We reverse the trial court's judgment and render judgment in favor of Falcon.

## I. BACKGROUND[3]

In April 2008, Cantu refinanced a mortgage on a 64-unit apartment complex in McAllen, Texas with Falcon. The note, in the amount of $2,700,000, provided for repayment over ten years in monthly payments of $20,150 at an interest rate of 6.5%, and was secured by a deed of trust on the apartment complex. Shortly after executing

---

[2] Unless otherwise stated, we will refer to appellees collectively as "Cantu."

[3] The facts are taken from Falcon's brief and the testimony at trial. Cantu did not file a brief to assist us in the disposition of this case.

the note, in May 2008, Cantu filed for bankruptcy. The bankruptcy court appointed a trustee, Michael Schmidt, to take possession of Cantu's non-exempt assets. Schmidt assumed the operation of the apartment complex and tried unsuccessfully to sell the property. In April 2010, Schmidt relinquished control of the complex to Falcon. Although Falcon was entitled to foreclose on the complex, it did not do so. Cantu met with Bobby Martinez, then a vice-president at Falcon, to discuss modification of the loan and a proposal for Cantu to resume operation of the complex.

On June 28, 2010, Cantu and Falcon signed a written modification of the mortgage note which provided that, for a ten-month period from May 2010 to February 2011, Cantu would pay no principal on the loan, but only monthly accrued interest. The modification agreement provided that Cantu's monthly principal payments of $20,150 would resume on March 20, 2011. The modification agreement contained a "no oral agreements" merger clause.

Cantu contends that prior to executing the written modification agreement, Martinez promised him that at the end of the ten-month period covered in the written modification agreement, Falcon would extend the term of the note from 10 years to 25 years (or amortize the note over 25 years) and reduce the interest rate from 6.5 percent to 5 percent. Cantu also contends that in reliance on the oral agreement, he spent $375,728 in improvements on the apartment complex.

Cantu subsequently defaulted on the loan payments and other obligations under the note.[4] Falcon sought to foreclose on the property. In February 2012, Cantu sued Falcon, alleging various causes of action including breach of contract, fraud, fraud in the

---

[4] For example, the loan agreement required Cantu to deposit the property's rental income in an account at Falcon, to pay all taxes on the property, and pay for and maintain insurance on the property.

3

inducement, and breach of fiduciary duty. Cantu also obtained a temporary injunction restraining Falcon from foreclosing on the property. Cantu sought a jury trial; Falcon objected on the ground that the modification agreement contained a jury waiver. After the trial court denied Falcon's objection, Falcon successfully sought a petition for writ of mandamus to enforce the jury waiver provision. *See In re Falcon Int'l Bank*, No. 13-12-00326, 2012 WL 2052409, at \*2 (Tex. App.—Corpus Christi June 5, 2012) (orig. proceeding) (mem. op.).

The case proceeded to a bench trial in August 2012 on Cantu's claims of breach of contract, fraudulent inducement, fraud, and breach of fiduciary duty and Falcon's counterclaims of breach of contract, tortious interference with contractual relationship, and unlawful appropriation of rental income. In January 2013, the trial court issued findings of fact and conclusions of law. In August 2013, the trial court rendered judgment in Cantu's favor without specifying the cause or causes of action on which the court was granting relief. The trial court also rendered judgment that Falcon take nothing by way of its counterclaims. Falcon filed a motion for new trial, which was denied by operation of law.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Aland v. Martin*, 271 S.W.3d 424, 428–29 (Tex. App.—Dallas 2008, no pet.); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). When, as here, the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for sufficiency of the evidence. *Sharif v. Steen Auto, LLC,* 370 S.

4

W.3d 126, 147 (Tex. App.—Dallas 2012, no pet.). We review the sufficiency of the evidence supporting the findings by applying the same standards we use in reviewing the legal and factual sufficiency of the evidence supporting a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Aland*, 271 S.W.3d at 429.

An appellant challenging the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof—here, Falcon—must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole would enable reasonable and fair-minded people to differ in their conclusions. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994); *Aland*, 271 S.W.3d at 429. We view the evidence in the light most favorable to the fact-finding, credit favorable evidence if a reasonable fact-finder could do so, and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 888 (Tex. App.—Dallas 2009, no pet.). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998); *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied).

To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and set aside the finding only if it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Alan*

5

*Reuber Chevrolet*, 287 S.W.3d at 888. In a bench trial, the trial court judges the credibility of the witnesses, determines the weight to be given to their testimony, and resolves conflicts and inconsistencies in the testimony. *See City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 778 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the fact-finder's, even though, after reviewing the evidence, we would reach a different conclusion from that of the trier of fact. *Essex Crane Rental Corp. v. Striland Constr. Co., Inc.*, 753 S.W.2d 751, 755 (Tex. App.—Dallas 1988, writ denied.); *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex. App.—-Dallas 1986, writ ref'd n.r.e.).

We review a trial court's conclusions of law de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Bollner v. Plastics Solutions of Tex., Inc.*, 270 S.W.3d 157, 166 (Tex. App.—El Paso 2008, no pet.). When reviewing the trial court's legal conclusions, we evaluate them independently, determining whether the trial court correctly drew the legal conclusions from the facts. *Dallas Morning News v. Bd. of Trs.*, 861 S.W.2d 532, 536 (Tex. App.—Dallas 1993, writ denied). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Mack v. Landry*, 22 S.W.3d 524, 528 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

## III. DISCUSSION

### A. Findings of Fact and Conclusions of Law

The trial court issued findings of fact and conclusions of law as follows:

**FINDINGS OF FACT**

1. Defendant Falcon International Bank "Falcon" and Canflor, L.P. "Canflor" entered into a Commercial Real Estate Lien Note on April

6

20, 2008, in the principal amount of $2,700,000.00 ("Note") and a Loan Agreement, along with a Deed of Trust securing the Note, pledging the real estate hereinafter referred to as "The Apartments" . . . .

2. Plaintiff Mark Cantu "Cantu" personally guaranteed the Commercial Note and executed a written guaranty agreement ("Guaranty") on April 20, 2008. The terms of the note included a term of ten (10) years, an interest rate of 6.5%, with principal and interest payments of $20,150.00 and escrow payments for ad valorem taxes and insurance of $6,850.00.

3. Prior to April 2008, these apartments had been financed with First National Bank. Robert "Bobby" Martinez, Senior Vice President of Falcon, solicited Canflor, and more specifically, Cantu's business.

4. Falcon, a Laredo bank, had expanded to McAllen, first renting space from Cantu in his office building known as The Atrium. They solicited his business, and Cantu was told and reasonably believed that Bobby Martinez had full authority to do whatever needed to be done to secure his business and keep it.

[5.] [sic] opening reception of one of their new McAllen branch locations and informed Mr. Cantu that they had instructed Mr. Martinez to take good care of him, that he had "full authority", and that "we want your business". Mr. Martinez also possessed apparent authority by virtue of this position to act on behalf of Falcon and negotiate terms with Canflor and Cantu.

6. Falcon knew that Cantu was litigious and had sued International Bank of Commerce with whom he had loans and lines of credit personally and for his businesses of close to Twenty Million Dollars, but solicited his business anyway.

7. It was considered "desirable" by Falcon to court Cantu's and Canflor's business, as he had the potential to double Falcon's McAllen commercial portfolio, and obtaining the note on the apartments alone constituted more than ten (10) percent of Falcon's McAllen business.

8. Mark Cantu owned all the interest in Canflor, L.P. as its president, sole limited partner, and 99% owner and president of its general partner, Camflor, Inc.[5]

---

[5] We note that "Camflor, Inc." is a separate business entity from "Canflor, L.P."

7

9. Falcon knew that Canflor had no other income or assets besides the apartments, and that any money needed beyond revenue from rents would have to come from Cantu personally or his law practice or other businesses.

10. Cantu and his real estate holdings company, MarRox, Inc. made long term real estate investments that required transfer of money between them, Cantu personally, and his law practice to service his more than Thirty Million Dollars ($30M) in loans and lines of credit.

11. Cantu filed for Chapter 11 Bankruptcy protection in May 2008. Falcon was aware of the bankruptcy and as one of the secured creditors, approved his reorganization plan.

12. Following a judgment against him and leading up to his bankruptcy, Cantu conducted his business and personal transactions largely in cash. Cantu co-mingled funds from his law practice and companies, including Canflor, and was a very poor record keeper.

13. Cantu and MarRox, Inc., were converted from Chapter 11 to Chapter 7 liquidation, and an Order Authorizing Trustee, Michael Schmidt, to Operate Properties was signed by U.S. Bankruptcy Judge on July 13, 2009.

14. The Trustee did operate the apartments from July 2009 and ceased operating the apartments on April 30, 2010.

15. The Trustee had a fiduciary duty to the creditors, Falcon being the secured creditor of the apartments, with the charge of protecting that asset and operating the business of those apartments such that the asset would be maintained, and the creditors would be paid.

16. During the approximately ten (10) months that Trustee operated the apartments, $317,510.57 was collected in rent for an average of approximately $31,000.00 per month.

17. During that time, the Trustee made eight (8) consecutive monthly payments to Falcon from July 2009 to February 2010 in the amount of $20,150.00 for principal and interest on the Note, ten (10) consecutive monthly payments to Falcon for property insurance in the amount of $1,800.00, but no payments for ad valorem taxes to Falcon or the taxing authorities.

18. In addition to the payments for principal and interest and insurance, Trustee incurred and paid, on average, reasonable fixed costs for

management, maintenance, repairs, utilities, phone, and cable of approximately $8,705.56 per month.

19. Taxes and insurance which were $6,850.00 monthly could not be reduced; fixed costs could not be reduced from $8,705.56; and the Trustee had raised rents to the highest amount the market would bear, yet The Apartments would not cash flow absent a permanent modification of The Note.

20. A Bankruptcy Trustee determines whether to sell or abandon an asset, in part, on whether it is an asset that can generate money for the estate to satisfy creditors, and in this case, the apartments simply "did not generate enough revenue to meet all of the liabilities".

21. The evidence is clear that Falcon did, in fact, enter into oral agreements, and that oral agreements were a custom and practice. For example, Falcon entered into an oral "modification" with the Trustee and "forgave" the payments of April and May 2010.

22. There was no written notification or evidence whatsoever of an intent to foreclose or exercise collateral rights or rights to take over the apartments during the time the Trustee operated them, yet the uncontroverted evidence was that the Trustee filed a Notice Ceasing Operations and did, in fact, c[e]ase operations on April 30, 2010, with the intention to return the apartments to Falcon for foreclosure based upon verbal conversations he had with Falcon.

23. Falcon, through their [sic] agent Bobby Martinez, approached Cantu about resuming control and operation of the apartments, rather than having Falcon operating them itself or foreclosing. Prior to the real estate slump, in 2007, the apartments had been valued at approximately $3.5 million, and Falcon believed Cantu could restore value. It was Falcon, through Martinez, that again solicited Cantu saying "you keep your apartments, and we keep the loan. We modify the loan and keep it on the books".

24. There was sufficient equity in The Apartments at the time the Trustee abandoned them to satisfy all liabilities, including the Falcon Note and outstanding taxes. If Falcon had foreclosed, there would have been no deficiency.

25. Falcon believed that despite the Trustee's testimony that the apartments generated an average of $31,000.00 per month and that was the maximum revenue which could reasonably be generated, Mark Cantu could increase revenue.

9

26. At the time the Trustee abandoned the apartments and during the time Cantu and Canflor were considering resum[ing] control, Cantu and MarRox had not been denied a discharge, the significance of which is "to obtain a fresh start" "so that the debts he (Cantu) had are not enforceable against him anymore".

27. The personal guarantee under the Note of Cantu was a dischargeable debt and Cantu believed he was going to get a release from that liability in his bankruptcy.

28. By that time, Bobby Martinez, having met with Cantu socially and for business in person up to trice [sic] weekly in addition to telephone conversations, was well aware with Cantu's personal and financial situation, including the following:

   • Cantu's wife of 24 years, Roxanne Cantu, had never worked outside the home;

   • Cantu's three (3) children are completely financially dependent upon him;

   • Cantu was in very poor health;

   • Cantu was expecting to enjoy a discharge in bankruptcy from any debt to Falcon;

   • Cantu personally and through his company MarRox had lost all of his real estate holdings with the exception of the apartments;

   • Cantu had limited resources, and it would be a "big sacrifice" for Cantu and his family to take over the apartments;

   • Cantu was required to be careful in his investments;

   • Any money needed to bring the apartments "back up" would have to come from Cantu personally.

29. Bobby Martinez represented to Cantu that if he and Canflor would take back the apartments and make such necessary improvements and marketing efforts to increase occupancy, Falcon International Bank would provide a 10 month loan modification reducing the monthly liability payment to interest and escrow which would be followed by a permanent [loan modification] with an interest rate not to exceed five percent (5%), with payments based on a 25 year amortization schedule, with the original ten (10) year term.

30. Cantu and Canflor reasonably relied on the representations and promises of Martinez based upon his history of delivering on promises as well as Cantu's extensive oral dealings with banks.

31. The evidence was uncontroverted that Cantu "would not have ever, ever, ever....never" have taken possession and control of the apartments or reaffirmed any personal guarantee or other debt on those apartments without a temporary to permanent modification of the loan terms. It was a "bad investment" as the evidence was equally clear and unequivocal they would never cash flow absent a permanent modification of the loan, especially in the condition in which they were in at the time the Bankruptcy Trustee had abandoned them to Falcon.

32. In late April or early May 2010, Falcon, Cantu, and Canflor entered into an oral modification whereby Canflor and Cantu would regain control of the apartments for a period of approximately ten (10) months with reduced payments of interest only on the outstanding balance of $2,590,969.23 of approximately $14,000.00, plus escrow for taxes and insurance in the amount of $6,850.00 monthly.

33. The agreement was made between Cantu and Martinez and initially done on a handshake with Martinez representing "Mark (Cantu), I'm gonna get it done take over [sic] the apartments and spend the money", and ultimately the temporary modification was put into writing.

34. The parties performed on the oral contract, as Canflor and Cantu regained possession of the apartments May 1, 2010; Falcon took no steps towards foreclosure; and Canflor made payments to Falcon of $19,000.00 on May 7, 2010 and $1,150.00 on May 21,2010 in the absence of any written contract.

35. The written Modification covers the period from May 20, 2010, through February, 20, 2011, but was not reduced to writing or signed by any party until June 30, 2010.

36. The performance by the parties between May 1, 2010 and the execution of a written document on June 30, 2010 unequivocally [sic] refers to the Modification Agreement and corroborates its existence, and the performance could have no other purpose than to fulfill the agreement, as the [sic] Canflor and Cantu were once again in possession of The Apartments; no foreclosure action was pursued; and payments were made by Canflor to Falcon.

11

37. As a part of the modification, Cantu spent $375,728.00, over the initial modification period, largely from his personal funds, making the necessary improvements to increase occupancy, thus revenue. Canflor had no other assets, and insufficient revenue from rents to pay for these improvements.

38. Robert Bobby Martinez directed how the improvement money was to be spent and was often physically present at the apartments supervising and directing improvements.

39. The evidence was uncontroverted that Martinez represented that he would permanently modify the loan to a 5% fixed rate amortized over 25 years with a 10 year balloon, and clear that this representation was made prior to Canflor regaining control of the apartments from the Trustee, as absent a permanent modification, the apartments were a "bad investment" and would "never cash flow".

40. Martinez knew, and Cantu did suffer financial, mental, physical, and marital stress and hardship as a result of entering into the modification agreements with Falcon, including loss of sleep, elevated blood pressure, physical sickness, marital arguments, and shingles if Falcon failed to abide by agreement.

41. The evidence was uncontroverted that Cantu believed Martinez and reasonably relied upon his representations.

42. Falcon intended for Cantu and Canflor to act upon their representations, as Falcon "believed Mr. Cantu could get them (the apartments) up to where it wanted to be".

43. Canflor was ready, willing and able to perform and pay under the terms of the permanent modification that had been promised, as the revenue did actually increase under the efforts of Cantu.

44. On or about March 20, 2011, the temporary modification for the loan of the apartments expired with no permanent fix in place. Defendant Falcon also terminated Robert Martinez'[s] employment. The payments, thus rose for principal and interest only to $20,150.00, plus escrow of $6,850.00 for current taxes, and tax arrearages were due in excess of $250,000.00.

45. Canflor, L.P. made payments to Falcon between May 1, 2010, and June 30, 2011 totalling [sic] $342,797.28, of which, $75,350.00 were specifically designated by Falcon as "Escrow Payments".

12

46. From May 1, 2010 to the time of suit, despite receiving $75,350.00 in escrow payments from Canflor, L.P., Falcon failed to make any payments of ad valorem taxes.

47. Of the $342,797.28 in payments made by Canflor, L.P. to Falcon Bank from the time they regained control from the Trustee, not one cent was applied to principal or ad valorem taxes.

48. As evidenced by lack of any paperwork, whatsoever in the loan file to indicate Bobby Martinez ever even attempted to obtain long term modification of the loan, despite his constant presence and discussions with Cantu and Canflor.

49. Canflor made payments to Falcon $342,797.28 during the pendency of the loan.

50. Cantu suffered mental anguish as a result of the transactions in question.

## CONCLUSIONS OF LAW

1. The elements for a breach of contract cause of action is (1) the existence of a legal contract; (2) the plaintiff performed or tendered performance according to the terms of the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the breach.

2. In this case, the parties entered into a contract concerning reassumption of the loan on the apartments and the improvement thereof. Canflor and Cantu tendered perform[ance] by improving the apartments, and by indicating a willingness to sign the final documents. Falcon breached the agreement by refusing to prepare and deliver the final documents reflecting the parties['] agreement.

3. The statute of frauds does not constitute a defense to breach of contract, because the parties commenced performing the contract, even though it was not in writing.

4. The elements of fraud are: (1) a material representation was made; (2) the material representation was false; (3) when the material representation was made, the speaker knew that the material representation was false, or made the material representation recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the material representation with the intent that it should be acted upon; (5) the person to whom the material representation was made acted in reliance upon the

13

representation; and (6) the person to whom the material representation was made suffered injury or damage.

5. If a party enters into a contract, with no intent to perform it, he is guilty of fraud.

6. Only slight circumstantial evidence is required to prove fraud. The entirety of the defendant's conduct must be considered. This not only includes the breach of contract itself, but all conduct subsequent thereto.

7. A defendant's fraudulent intent is proved from circumstantial evidence. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given their testimony." *Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 770 (Tex. App.—El Paso 2004, no pet.).

8. "The fact that the defendant makes no pretense of performance may also be considered in showing a lack of intent." *W&F Transp., Inc. v. Wilhelm*, 208 S.W.3d 32, 48 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

9. Falcon is guilty of fraud. It made material misrepresentations to Mark Cantu and Canflor concerning the loan modification, and such representations which were false. Falcon knew the representations were false when made or made such representations recklessly without any knowledge of its truth and as a positive assertion. Falcon never did anything to effectuate the loan modification; instead, knowing the apartments could not cash flow, Falcon intended to accept the benefits of Cantu's and Canflor's improvements and then foreclosing. As a result, they have been injured.

10. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached this duty; and (3) the breach must result in injury to the plaintiff or benefit to the defendant.

11. As a general rule, no fiduciary duty exists between a bank and a borrower. However, two exceptions to this rule exists. First, if the customer is depositing money into the bank, a special relationship exists. Likewise a special or fiduciary relationship exists when the lender exercises excessive control over, or influence in, the borrower's business activities. This Court finds that both exceptions apply.

12. As a fiduciary, Falcon owed to Cantu and Canflor loyalty, good faith, integrity in all matters, fair honest dealing, avoidance of conflicting positions, and disclosure of all material information. Falcon breached this fiduciary duty because it failed to act in good faith, failed to deal honestly, and failed to disclose all relevant information.

13. As a result of such breach of fiduciary duty, Cantu and Canflor have been injured.

14. Mental anguish cannot be recovered for breach of contract. Mental anguish can be recovered for fraud and breach of fiduciary duty.

15. The fundamental principle in determining damages is that the parties should be placed in the status quo ante (especially when [rescission] is sought), to the extent possible. As a collary [sic] to this, a wrong doer should not benefit by its wrongdoing.

16. The doctrine of election of remedies is disfavored. "The sole purpose of the doctrine of election of remedies is to prevent double recovery for a single wrong." *Green Oaks, Ltd. v. Cannan*, 749 S.W.2d 128, 131 (Tex. App.—San Antonio 1987), writ denied per curiam, 758 S.W.2d 753 (Tex. 1988). Consequently, the doctrine does not apply when the defendant commits more than one wrongful act, which gives rise to a different set of damages. In other words, a plaintiff can recover for both breach of contract and tort, as long as the damages awarded do not constitute a double recovery. Accordingly, Plaintiffs are not required to elect a remedy or cause of action, because the damages awarded do not overlap or constitute a double recovery.

17. Canflor and Cantu are entitled [to] $375,728.00, jointly and severally. Said amount constitutes the costs of the improvements made to the apartments. Such payments are recoverable under breach of contract, fraud and breach of fiduciary duty.

18. CanFlor, LP is entitled to an additional $342,797.28. Said amount constitutes the amount of payments made to Falcon after the apartments were abandoned by the Trustee. Such amounts are recoverable under breach of contract, fraud and breach of fiduciary duty.

19. Cantu is entitled to $375,000 as compensation for mental anguish. Such amounts are recoverable under fraud and breach of fiduciary duty.

15

20. Cantu and CanFlor are entitled to reasonable attorney's fees, both as a result of breach of contract, and as an element of exemplary damages.

21. Reasonable and necessary attorney's fees up through the trial of this matter is $70,000.00.

22. Reasonable and necessary attorney's fees in this matter for an appeal to the Court of Appeals is $50,000.00.

23. Reasonable and necessary attorney's fees in this matter for preparation of or responding to a petition for review with the Texas Supreme Court is $15,000.00.

24. Reasonable and necessary attorney's fees in this matter for preparation of a brief on the merits with the Texas Supreme Court is $25,000.00.

25. Appellate attorney's fees are conditioned on success of the appeal.

26. Falcon is permitted to foreclose on the property.

27. Cantu and Canflor are absolved of any deficiency on the property after foreclosure because Falcon would have been made whole if they foreclosed on the property when the Trustee abandoned it.

28. The standard for an award of exemplary damages is clear and convincing evidence.

29. Exemplary damages cannot be awarded for breach of contract.

30. Exemplary damages can be awarded solely upon clear and convincing proof of breach of fiduciary duty.

31. Exemplary damages can be awarded solely upon proof of fraud.

32. Because of the nature of Falcon's conduct, CanFlor is entitled to exemplary damages in the amount of $375,000.

33. Because of the nature of Falcon['s] conduct, Cantu is entitled to exemplary damages in the amount of $375,000.

34. Pre-judgment interest cannot be awarded on attomey's fees and exemplary damages.

35. Plaintiffs are entitled to pre-judgment interest at the rate of 5% on all damages (except attorney's fees and exemplary damages) from the filing of the lawsuit until the entry of the judgment.

36. Plaintiffs are entitled to post-judgment interest at the rate of 5% on the entire judgment until satisfied.

(citations to record and some citations to authorities omitted).

## B.    Breach of Contract

By its first issue, Falcon contends the evidence is legally and factually insufficient to establish that the parties entered into a valid oral agreement. Specifically, Falcon argues that the parol evidence rule bars Cantu from providing evidence of any alleged oral agreement contrary to the terms of the parties' written modification agreement. Secondly, Falcon argues that the statute of frauds bars Cantu from recovering on any alleged oral agreement with Falcon. *See* TEX. BUS. & COM. CODE ANN. § 26.02(b) (West, Westlaw through 2013 3d C.S.) (providing that a loan agreement for an amount over $50,000 is not enforceable unless in writing and signed by the party to be bound).

The trial court found that Martinez told Cantu that if Cantu took over the management of the apartments and made improvements to the properties, Falcon would, at the end of the ten-month loan modification period, provide a permanent modification of the loan agreement, which would lower the interest rate to 5% and adjust payments based on a 25-year amortization schedule. The trial court concluded that "Falcon breached the agreement by refusing to prepare and deliver the final documents reflecting the parties['] agreement."

Cantu testified that prior to the execution of the written modification agreement on June 30, 2010, he and Martinez orally agreed that, at the end of the ten-month period covered in the written modification agreement, Falcon would provide a permanent

17

modification of the loan agreement, which would lower the interest rate to 5% and amortize the payments over a 25-year term. The written modification agreement contains a merger clause, which provides:

> **<u>NOTICE</u>: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THIS LOAN CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**
>
> **THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS LOAN.**

The written loan modification agreement provides that, at the end of the ten-month period covered in the agreement, "the monthly payment will resume to $20,150.00 plus a monthly escrow payment of $6,850.00." Cantu testified that he read the written loan modification agreement before he signed it.

When parties reduce an agreement to writing, the law of parol evidence presumes, in the absence of fraud, accident, or mistake, that any prior or contemporaneous oral or written agreements merged into the final written agreement. *See DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist. 2008, no pet.); *Garner v. Fidelity Bank, N.A.*, 244 S.W.3d 855, 860 (Tex. App.—Dallas 2008, no pet.). "This is particularly true where the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision." *Garner*, 244 S.W.3d at 860. The terms of a promissory note cannot be contradicted or varied by parol evidence of a manner of payment other than as expressed in the note. *DeClaire*, 260 S.W.3d at 45.

Cantu's testimony regarding the alleged oral agreement was inconsistent with the written loan modification agreement, and was thus inadmissible parol evidence. *See DeClaire*, 260 S.W.3d at 46. Because the trial court could not rely on parol evidence, we conclude Cantu presented less than a scintilla of evidence that the parties had a valid oral agreement. *See Formosa Plastics*, 960 S.W.2d at 48. Similarly, we set aside the trial court's findings that rest solely on Cantu's testimony regarding the alleged oral agreement because the evidence supporting those findings is so weak that the findings are clearly wrong and unjust. *See Plas-Tex, Inc.*, 772 S.W.2d at 445. We hold that the trial court erred in concluding that Falcon breached any alleged oral agreement. We sustain Falcon's first issue.[6]

## C.      Fraud or Fraud in the Inducement

By its second issue, Falcon contends that the evidence is legally and factually insufficient to support the trial court's findings and conclusions that Falcon committed fraud or fraud in the inducement. We agree.

> To recover on an action for fraud, the plaintiff must prove that (1) a material representation was made; (2) the representation was false; (3) when the speaker made the representation, he knew it was false or made it recklessly without knowledge of the truth as a positive assertion; (4) the speaker made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) the party thereby suffered injury.

---

[6] Because we agree with Falcon that the parol evidence rule barred the trial court from considering Cantu's testimony regarding the alleged oral agreement, we need not consider Falcon's argument that Cantu's testimony was also barred by the statute of frauds. *See* TEX. R. APP. P. 47.1; TEX. BUS. & COM. CODE ANN. § 26.02(b)–(d) (West, Westlaw through 2013 3d C.S.)*; Hawkins v. Ehler*, 100 S.W.3d 534, 540 (Tex. App.—Fort Worth 2003, no pet.) ("Oral conditions of loans over $50,000 are void . . . ."); *see also Hern F.I.P. v. Compass Bank*, 863 F.Supp.2d 613, 625 (S.D. Tex. 2012) ("[T]here is no exception to the Statute of Frauds due to partial performance. . . . Importantly, the actions asserted to constitute partial performance must be unequivocally referable to the alleged oral agreement and corroborate the existence of that agreement; they must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff. Plaintiffs' actions could have been intended to pay the already existing debt that [landowner] owed Defendant.") (internal quotations omitted).

One of the elements of a fraud claim is that the plaintiff actually and justifiably relied on the misrepresentation to suffer injury. In this regard, a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.

*DeClaire*, 260 S.W.3d at 46-47 (internal citations omitted); *see also In re Int'l Bank of Commerce*, No. 13-07-693-CV, 2008 WL 192260, at * 16 (Tex. App.—Corpus Christi Jan. 18, 2008, orig. proceeding) (mem. op.) ("A party claiming fraud must prove actual and justifiable reliance on a misrepresentation. . . . [R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.") (internal citations omitted).

"Causes of action for fraudulent inducement and negligent misrepresentation require proof of reliance. The plaintiff must have both actually and *justifiably* relied on the alleged misrepresentation to suffer a compensable injury." *Miller Global Prop., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 347-48 (Tex. App.—Dallas 2013, pet. denied) (internal citations omitted) (emphasis in original).

The trial court found that Cantu "reasonably relied" on Martinez's representation "that he would permanently modify the loan to a 5% fixed rate amortized over 25 years . . . ." The trial court concluded that Falcon was guilty of fraud based on its misrepresentations concerning the loan modification.

Falcon argues that Cantu could not have justifiably relied on any oral representations by Martinez that were contrary to the express terms of the original loan and written modification agreement. In *In re Int'l Bank of Commerce*, this Court rejected

20

the Cantus' argument that they relied on a prior oral representation which was directly contrary to the merger and "no oral agreements" clauses in the loan documents. *See In re Int'l Bank of Commerce*, 2008 WL 192260, at *17. We held, as a matter of law, that the Cantus could not have reasonably relied on prior oral representations contrary to the direct, clear, and unambiguous language in the many documents they signed. *See id.*[7] Similarly, we hold in the present case, as a matter of law, that Cantu could not have justifiably relied on any prior representations by Martinez contrary to the clear unambiguous language contained in the written loan modification. Accordingly, Cantu presented no evidence of justifiable reliance, and the trial court erred in concluding that Falcon was guilty of fraud.[8] We sustain Falcon's second issue.

### D. Breach of Fiduciary Duty

By its third issue, Falcon contends that the trial court erred in concluding that Falcon breached its fiduciary duty to Cantu. Although the trial court acknowledged that generally, no fiduciary duty exists between a bank and a borrower, it found that there are two exceptions, both of which it found to be applicable in this case: (1) when a bank customer deposits money in a bank; and (2) when the bank exercises excessive control over the borrower's business activities.

---

[7] In *In re Int'l Bank of Commerce*, the Cantus claimed that they had not read the written documents. *In re Int'l Bank of Commerce*, No. 13-07-693-CV, 2008 WL 192260, at * 17 (Tex. App.—Corpus Christi Jan. 18, 2008, orig. proceeding) (mem. op.). Here, however, Cantu testified that he read the written loan modification and knew that it contained the merger and "no oral agreements" clauses.

[8] We note that, in its conclusions of law, the trial court did not address the issue of Martinez's authority to bind Falcon. In its findings of fact, the trial court found that Cantu "reasonably believed" that Martinez "had full authority to do whatever needed to be done to secure [Cantu's] business and keep it." The trial court also found that Martinez also possessed "apparent authority" by virtue of his position to act on behalf of Falcon.

21

Fiduciary duties may arise from certain formal relationships that are considered to be fiduciary as a matter of law or from informal, "confidential" relationships. *Garcia v. Vera*, 342 S.W.3d 721, 724 (Tex. App.—El Paso 2011, no pet.). To recover on a claim for breach of fiduciary duty, one of the elements that must be established is the existence of a fiduciary or confidential relationship. *Id.* The existence of such a relationship is ordinarily a question of fact, but it becomes a question of law when there is no conflicting evidence on the issue. *Id.* Texas courts are reluctant to recognize informal fiduciary relationships. *Id.* The relationship between a borrower and a lender or a bank and its customers does not usually create a special or fiduciary relationship. *See Jones v. Thompson*, 338 S.W.3d 573, 583 (Tex. App—El Paso 2010, pet. denied) (holding lenders generally owe no fiduciary duties to their borrowers).

We turn first to the trial court's conclusion that a special or fiduciary relationship exists when a customer deposits money in a bank. In support of this conclusion, the trial court cited *Plaza National Bank v. Walker*, 767 S.W.2d 276, 277–78 (Tex. App.—Beaumont 1989, writ denied). However, in *Eller v. NationsBank of Texas, N.A.*, the Amarillo Court of Appeals noted:

> [S]ince *Plaza*, the Texas Supreme Court has reaffirmed the long-settled principle that the duty of good faith does not arise in ordinary commercial transactions. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs., Inc., 960 S.W.2d 41, 52* (Tex. 1998). So too has it recognized that the mere relationship of debtor and creditor is not sufficiently special to impose a duty of good faith upon its parties. *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–709 (Tex. 1990). Since the relationship between a bank and its depositor is one of debtor and creditor, *Plaza* has been implicitly overruled.

22

975 S.W.2d 803, 809 (Tex. App.—Amarillo 1998, no pet.). We agree with the *Eller* Court and decline to follow *Plaza*. We conclude that the relationship between Cantu and Falcon—that of a debtor and creditor—did not create a fiduciary relationship. *See id.*

We turn next to the trial court's conclusion that a fiduciary duty arose from Falcon's excessive control over Cantu's business activities. This was apparently based on the trial court's finding that "Martinez directed how the improvement money was to be spent and was often physically present at the apartments supervising and directing improvements."

The trial court cited two cases in support of its conclusion: *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996, writ dism'd by agr.), *called into question on other grounds by Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 724 (Tex. 2001), and *Greater Southwest Office Park, Ltd. v. Texas Commerce Bank National Association*, 786 S.W.2d 386, 391 (Tex. App.—Houston [1st Dist.] 1990, writ denied). In *Farah*, the corporate debtor alleged that its lenders forced the election of a new chief executive officer, installed directors loyal to the banks, and interfered with the company's corporate governance. 678 S.W.2d at 668. Here, even assuming, without deciding, that Martinez supervised improvements to the apartments, such conduct was merely consistent with protecting Falcon's interest in the property securing the loan. "[T]he ability of a lender to monitor a debtor's expenditures pursuant to a loan agreement represents a veto power which is negative in nature" and generally "does not amount to domination or control." *Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1355 (5th Cir. 1987) (analyzing whether there was sufficient control to consider lender and borrower to be alter egos).

In *Greater Southwest Office Park, Ltd.*, the First Court held that a lender's mere subjective trust in a bank was insufficient to transform a debtor/creditor relationship into a fiduciary relationship. 786 S.W.2d at 391. Neither of the authorities cited by the trial court support its conclusion. We hold that Cantu did not establish that Falcon owed him a fiduciary duty. Accordingly, the trial court erred in concluding that Falcon breached any fiduciary duty. We sustain Falcon's third issue.

### E.    Mental Anguish Damages, Exemplary Damages, and Attorney's Fees

By its fourth issue, Falcon contends that the trial court erred in awarding Cantu $375,000 in mental anguish damages, $375,000 in exemplary damages, and $70,000 in attorney's fees. We have already determined that there is insufficient evidence to support any of Cantu's causes of action. Accordingly, there was no basis for the trial court's award of mental anguish damages, exemplary damages, or attorney's fees. *See Montemayor v. Ortiz*, 208 S.W.3d 627, 658–59 (Tex. App.—Corpus Christi 2006, pet. denied) (finding no basis for award of punitive or mental anguish damages where no finding of wrongdoing). We sustain Falcon's fourth issue.

### F.    Single Satisfaction Rule

By its fifth issue, Falcon contends the trial court's judgment impermissibly allows Cantu to recover in contract and in tort for a single injury. Falcon notes that the trial court's judgment permitted Cantu to recover both attorney's fees on his contract claim and mental anguish and exemplary damages on his tort claims. We need not address this issue because we have already determined that the evidence was insufficient to support any of Cantu's claims.

### G.    Falcon's Recovery of Deficiency

24

By its sixth and final issue, Falcon contends the trial court erred in ruling that it could not seek to recover any deficiency remaining on the balance of its loan after it foreclosed on the apartment complex.[9] Falcon argues that the trial court erred in so holding because: (1) Cantu did not request any such relief in his pleadings; and (2) the ruling is inconsistent with the trial court's acknowledgment that Cantu had failed to repay the $2,700,000 loan.

We have reviewed Cantu's live pleadings and agree that Cantu did not request that Falcon be prohibited from seeking to recover any deficiency due on the loan.

In any event, the evidence in the record regarding whether there would have been a deficiency if Falcon had foreclosed in April 2010 does not support the trial court's finding. Schmidt testified that during his ten-month management of the apartments, he did not pay the ad valorem taxes, which amounted to approximately $6,850 per month. Schmidt testified that the highest offer he received for the sale of the apartments was $2.35 million. Schmidt stated that Falcon did not agree to the sale because the amount was less than was owed on the property. Apolonio Borrego Jr., a vice president of Falcon, testified that in May 2010, the apartments were appraised at $2.8 million. However, he also testified that past due ad valorem taxes were owed to Hidalgo County for 2008 through 2011 in the amount of $323,630.14. Borrego agreed that the amount of money owing on the property including the loan and taxes was in excess of $2.8 million. We conclude that the evidence does not support the trial court's finding that if Falcon had foreclosed when

---

[9] The trial court's Finding of Fact No. 24 stated: "There was sufficient equity in The Apartments at the time the Trustee abandoned them to satisfy all liabilities, including the Falcon Note and outstanding taxes. If Falcon had foreclosed, there would have been no deficiency." Conclusion of Law No. 27 stated: "Cantu and Canflor are absolved of any deficiency on the property after foreclosure because Falcon would have been made whole if they foreclosed on the property when the Trustee abandoned it."

25

Schmidt abandoned the apartments, there would have been no deficiency. The findings and conclusions are devoid of any other rationale to support the trial court's ruling prohibiting Falcon from seeking to recover any deficiency on the loan. We hold the trial court erred in prohibiting Falcon from seeking any deficiency on the loan. We sustain Falcon's sixth issue.

Falcon also asserts that, "If this Court reverses the trial court's judgment on Plaintiffs' claims, it should likewise reverse the trial court's judgment on Falcon's counterclaims." However, this argument is not further developed, and accordingly, we find it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

## IV. CONCLUSION

We reverse the trial court's judgment, and render judgment that Cantu take nothing on his claims against Falcon. We further render judgment that Falcon may exercise its right to recover for any deficiency remaining on its loan after foreclosing on the apartment complex.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
16th day of April, 2015.

26